7/6/2018 4:16 PM
Chris Daniel - District Clerk Harris County
Envelope No. 25802633
By: Walter Eldridge
Filed: 7/6/2018 4:16 PM

CAUSE NO. _____

| | | |
|---|---|---|
| LANDRY'S, INC., as successor in interest to LANDRY'S MANAGEMENT, L.P., | § § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, | § § § | |
| Defendant. | § § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURE

Plaintiff Landry's, Inc., as successor in interest to Landry's Management, L.P. ("Landry's") hereby files this Original Petition and Request for Disclosure against Defendant The Insurance Company of the State of Pennsylvania ("ICSOP") and would respectfully show the Court as follows:

## I.   DISCOVERY CONTROL PLAN

1.     Discovery in this matter is intended to be conducted under Level 2, pursuant to Rule 190.3 of the Texas Rules of Civil Procedure.

2.     Pursuant to Texas Rule of Civil Procedure 47(c), Landry's seeks monetary relief over $1,000,000 and non-monetary relief.

Exhibit B

## II.   PARTIES

3.     Landry's is a Delaware corporation with its principal place of business in Houston, Harris County, Texas.

4.     ICSOP is an insurer doing business in Texas and is a corporation organized and existing under the laws of the State of Illinois.  ICSOP maintains its principal place of business in New York.  ICSOP may be served through its registered agent for service of process: Corporation Service Company, 211 East 7th Street, Suite 620, Austin TX 78701.

## III.   JURISDICTION & VENUE

5.     The foregoing allegations are incorporated herein by reference.

6.     This Court has jurisdiction over this matter because the amount in controversy, exclusive of interest and costs, exceeds this Court's minimum jurisdictional limit.

7.     Venue is proper in this Court pursuant to Texas Civil Practice & Remedies Code § 15.002(a)(1) because all or a substantial part of the events or omissions giving rise to the claim occurred in Harris County at the time the cause of action accrued.

## IV.   BACKGROUND FACTS

### A.   The ICSOP Policies

8.     The foregoing allegations are incorporated herein by reference.

Exhibit B

### *The 2013-14 Landry's Policy*

9.      ICSOP issued Commercial General Liability Policy No. GL 192-97-17 to Fertitta Entertainment, Inc. ("FEI"), among others, for the period from September 24, 2013 to September 24, 2014 (the "2013-14 Landry's Policy").

10.      In addition to insuring FEI, the 2013-14 Landry's Policy insures any subsidiary, associated, affiliated, allied or acquired company or corporation (including subsidiaries thereof) of which any named insured, including FEI, has more than 50% ownership interest in or exercises management or financial control over at the inception of the policy, provided such subsidiary has been declared to ICSOP prior to the inception date of the 2013-2014 Landry's Policy.

11.      Landry's is and was at all relevant times a wholly owned subsidiary of FEI.

12.      Landry's was disclosed to ICSOP as a subsidiary of FEI prior to the inception of the 2013-14 Landry's Policy and is therefore insured under the 2013-14 Landry's Policy.

13.      Landry's Management, L.P. was also declared to ICSOP prior to the inception of the 2013-14 Landry's Policy and also qualifies as an insured under the 2013-14 Landry's Policy.

14.      The 2013-14 Landry's Policy insures, among other things, those sums in excess of the "Retained Limit" that the insureds become legally obligated to pay

as damages because of "personal and advertising injury," caused by an offense arising out of the insured's business committed in the "coverage territory" during the policy period.

15.     For purposes of the coverage afforded under the 2013-14 Landry's Policy, "personal and advertising injury" is defined to include "injury . . . arising out of . . . oral or written publication, in any manner, of material that violates a person's right of privacy."

16.     The 2013-14 Landry's Policy requires ICSOP to pay "Allocated Loss Adjustment Expenses," including defense costs, in excess of the "Retained Limit."

### *The 2013-14 Golden Nugget Policy*

17.     ICSOP issued Commercial General Liability Policy No. GL 192-97-19 to FEI, among others, for the period from September 24, 2013 to September 24, 2014 (the "2013-14 Golden Nugget Policy").

18.     In addition to insuring FEI, the 2013-14 Golden Nugget Policy insures any subsidiary, associated, affiliated, allied or acquired company or corporation (including subsidiaries thereof) of which any named insured, including FEI, has more than 50% ownership interest in or exercises management or financial control over at the inception of the policy, provided such subsidiary has been declared to ICSOP prior to the inception date of the 2013-2014 Golden Nugget Policy.

Exhibit B

19.    Landry's and Landry's Management, L.P. qualify as insureds under the 2013-14 Golden Nugget Policy pursuant to this provision.

20.    The 2013-14 Golden Nugget Policy insures, among other things, those sums that the insureds become legally obligated to pay as damages because of "personal and advertising injury," caused by an offense arising out of the insured's business committed in the "coverage territory" during the policy period.

21.    For purposes of the coverage afforded under the 2013-14 Golden Nugget Policy, "personal and advertising injury" is defined to include "injury . . . arising out of . . . oral or written publication, in any manner, of material that violates a person's right of privacy."

22.    Under the 2013-14 Golden Nugget Policy, ICSOP has a duty to defend suits seeking covered damages for "personal and advertising injury," as defined above.

### *The 2014-15 Landry's Policy*

23.    ICSOP issued Commercial General Liability Policy No. GL 192-97-17 to FEI and Landry's, Inc., among others, for the period from September 24, 2014 to September 24, 2015 (the "2014-15 Landry's Policy").

24.    In addition to insuring FEI and Landry's, the 2014-15 Landry's Policy insures any subsidiary, associated, affiliated, allied or acquired company or corporation (including subsidiaries thereof) of which any named insured, including

Exhibit B

FEI, has more than 50% ownership interest in or exercises management or financial control over at the inception of the policy, provided such subsidiary has been declared to ICSOP prior to the inception date of the 2014-15 Landry's Policy.

25.     Landry's and Landry's Management, L.P. qualify as insureds under the 2014-15 Landry's Policy pursuant to this provision.

26.     The 2014-15 Landry's Policy insures, among other things, those sums in excess of the "Retained Limit" that the insureds become legally obligated to pay as damages because of "personal and advertising injury," caused by an offense arising out of the insured's business committed in the "coverage territory" during the policy period.

27.     For purposes of the coverage afforded under the 2014-15 Landry's Policy, "personal and advertising injury" is defined to include "injury . . . arising out of . . . oral or written publication, in any manner, of material that violates a person's right of privacy."

28.     The 2014-15 Landry's Policy requires ICSOP to pay "Allocated Loss Adjustment Expenses," including defense costs, in excess of the "Retained Limit."

### *The 2014-15 Golden Nugget Policy*

29.     ICSOP issued Commercial General Liability Policy No. GL 192-97-19 to FEI, among others, for the period from September 24, 2014 to September 24, 2015 (the "2014-15 Golden Nugget Policy").

Exhibit B

30.     In addition to insuring FEI, the 2014-15 Golden Nugget Policy insures any subsidiary, associated, affiliated, allied or acquired company or corporation (including subsidiaries thereof) of which any named insured, including FEI, has more than 50% ownership interest in or exercises management or financial control over at the inception of the policy, provided such subsidiary has been declared to ICSOP prior to the inception date of this policy.

31.     Landry's and Landry's Management, L.P. qualify as insureds under the 2014-15 Golden Nugget Policy pursuant to this provision.

32.     The 2014-15 Golden Nugget Policy insures, among other things, those sums that the insureds become legally obligated to pay as damages because of "personal and advertising injury," caused by an offense arising out of the insured's business committed in the "coverage territory" during the policy period.

33.     For purposes of the coverage afforded under the 2014-15 Golden Nugget Policy, "personal and advertising injury" is defined to include "injury . . . arising out of . . . oral or written publication, in any manner, of material that violates a person's right of privacy."

34.     Under the 2014-15 Golden Nugget Policy, ICSOP has a duty to defend suits seeking covered damages for "personal and advertising injury," as defined above.

Exhibit B

35.     The 2013-14 Landry's Policy, the 2013-14 Golden Nugget Policy, the 2014-15 Landry's Policy and the 2014-15 Golden Nugget Policy are collectively referred to hereafter as the "ICSOP Policies."

36.     The ICSOP Policies were issued in the course of ICSOP's business in Texas.

**B.     The Chase Paymentech Lawsuit**

37.     On or about May 17, 2018, Paymentech, LLC and JPMorgan Chase Bank, N.A. (collectively "Chase Paymentech") filed suit against Landry's in the United States District Court for the Southern District of Texas, Houston Division, in a case styled *Paymentech, LLC and JPMorgan Chase Bank, N.A. v. Landry's Inc. as successor in interest to Landry's Management, L.P.*, Case No. 4:18-cv-01622 (the "Lawsuit").

38.     The Lawsuit alleges that as a result of a "Data Breach" which occurred at numerous Landry's properties during the following periods: May 4, 2014 through March 15, 2015; May 5, 2015 through December 3, 2015; and March 16, 2015 through May 4, 2015, Landry's "allowed cardholder account data to be put at risk." Ex. A (Complaint), ¶¶ 16-17.[1]

39.     The Lawsuit alleges that the data breach "involved the installation of a program on payment processing devices at certain Landry's Properties" which

---

[1] Attached as Exhibit A is a true and correct copy of the Plaintiffs' Original Complaint filed in the Lawsuit.

Exhibit B

resulted in a "compromise of Payment Instrument Information . . . including but not limited to, the cardholder's name, card number, expiration date, and internal verification code." *Id.* at ¶ 20.

40.    In the Lawsuit, plaintiffs allege contract, quantum meruit, and promissory estoppel claims, based on "costs associated with counterfeit magnetic-stripe losses and/or PIN data fraud losses as well as . . . card replacement, recoupment of disputed charges, legal fees, and increase in labor due to customer inquiries related to the compromise." *Id.* at ¶¶ 22, 46-73.

41.    The Lawsuit alleges "personal and advertising injury," as the allegations arise out of the alleged publication of private credit card information during a data breach event, which injured card members and violated card members' rights of privacy.

42.    As evidenced by the foregoing allegations, the Lawsuit seeks damages for "personal and advertising injury."

43.    Landry's timely provided notice of the Lawsuit to ICSOP and has satisfied all other conditions precedent to coverage under the ICSOP Policies (the "Claim").

44.    ICSOP denied Landry's Claim and refused any obligation under the ICSOP Policies with respect to the Lawsuit.

Exhibit B

45.     As a result of ICSOP's denial of the Claim and refusal to defend Landry's in the Lawsuit, Landry's has suffered substantial damages.

## V.     CAUSES OF ACTION

### A.     Breach of Contract

46.     The foregoing allegations are incorporated herein by reference.

47.     Each of the ICSOP Policies is a valid, enforceable contract.

48.     Landry's is insured under the ICSOP Policies.

49.     Landry's has satisfied all conditions under the ICSOP Policies.

50.     The terms of the ICSOP Policies and the allegations in the underlying Lawsuit unambiguously require ICSOP to defend and/or pay Landry's "Allocated Loss Adjustment Expenses" under one, more or all of the ICSOP Policies.

51.     Alternatively, the terms of the ICSOP Policies and/or the allegations in the underlying Lawsuit are ambiguous and must be construed in favor of coverage.

52.     ICSOP has breached the ICSOP Policies by failing to defend Landry's and/or pay Landry's "Allocated Loss Adjustment Expenses" in connection with the Lawsuit.

53.     ICSOP's breach of the ICSOP Policies has caused Landry's substantial damages.

Exhibit B

**B.     Declaratory Judgment**

54.     The foregoing allegations are incorporated herein by reference.

55.     An actual, justiciable controversy exists between Landry's and ICSOP regarding ICSOP's ongoing obligation to defend Landry's in connection with the Lawsuit under the 2013-14 Golden Nugget Policy and the 2014-15 Golden Nugget Policy.

56.     An actual, justiciable controversy exists between Landry's and ICSOP regarding ICSOP's ongoing obligation to pay Landry's "Allocated Loss Adjustment Expenses" in connection with the Lawsuit under the 2013-14 Landry's Policy and the 2014-15 Landry's Policy.

57.     Pursuant to Section 37.001, *et seq.* of the Texas Civil Practice and Remedies Code, Landry's seeks a declaration that ICSOP has a continuing obligation to defend Landry's in connection with the Lawsuit under the 2013-14 Golden Nugget Policy and/or the 2014-15 Golden Nugget Policy.

58.     Pursuant to Section 37.001, *et seq.* of the Texas Civil Practice and Remedies Code, Landry's seeks a declaration that ICSOP has a continuing obligation to pay Landry's "Allocated Loss Adjustment Expenses" in connection with the Lawsuit under the 2013-14 Landry's Policy and the 2014-15 Landry's Policy.

Exhibit B

**C.     Chapter 542 of the Texas Insurance Code.**

59.     The foregoing paragraphs are incorporated herein by reference.

60.     Landry's has made a Claim under the ICSOP Policies for defense expenses incurred in connection with the Lawsuit and has satisfied all conditions under the ICSOP Policies.

61.     ICSOP has engaged in conduct that constitutes violations of Chapter 542 of the Texas Insurance Code by denying its duty to defend and denying its duty to pay "Allocated Loss Adjustment Expenses" incurred by Landry's to defend the Lawsuit under the ICSOP Policies.

62.     Consequently, Landry's is entitled to the damages set forth in § 542.060 of the Texas Insurance Code including, in addition to the amount of the unpaid defense costs and/or "Allocated Loss Adjustment Expenses," interest at the rate of eighteen percent (18%) per annum as well as any and all other relief provided therein.

**D.     Attorney's Fees.**

63.     The foregoing allegations are incorporated herein by reference.

64.     Due to the actions of ICSOP, Landry's has been required to retain the services of the law firm of Haynes and Boone, L.L.P. of Dallas, Texas.  Landry's has agreed to pay Haynes and Boone a reasonable fee for its services necessarily rendered and to be rendered in this action.  Pursuant to Sections 37.009 and 38.001

Exhibit B

of the Texas Civil Practices & Remedies Code and/or Section 542.060 of the Texas Insurance Code, Landry's is entitled to an award of its reasonable attorneys' fees against ICSOP in an amount to be established at trial.

## VI.   JURY DEMAND

65.    Landry's hereby requests a jury trial pursuant to TEX. R. CIV. P. 216(a).

## VII.   PRAYER

WHEREFORE, Plaintiff Landry's, Inc. respectfully requests that this Court grant Plaintiff the following relief:

(1)    Judgment awarding Plaintiff all damages it has suffered as a result of Defendant's breach of the ICSOP Policies;

(2)    A declaration that ICSOP has a continuing obligation to defend Landry's in connection with the Lawsuit under the 2013-14 Golden Nugget Policy and the 2014-15 Golden Nugget Policy;

(3)    A declaration that ICSOP has a continuing obligation to pay Landry's "Allocated Loss Adjustment Expenses" in connection with the Lawsuit under the 2013-14 Landry's Policy and the 2014-15 Landry's Policy;

(4)    Judgment awarding Plaintiff all damages sustained as a result of Defendant's violations of Chapter 542 of the Texas Insurance Code;

Exhibit B

(5)    Judgment awarding Plaintiff all reasonable and necessary attorneys' fees and expenses incurred in this matter under Chapters 37 and 38 of the Texas Civil Practice & Remedies Code and/or Chapter 542 of the Texas Insurance Code;

(6)    Judgment awarding Plaintiff pre-judgment and post-judgment interest in the amount allowed by law;

(7)    Judgment awarding Plaintiff all costs of court; and

(8)    Such other and further relief to which Plaintiff may be justly entitled.

## VIII.  REQUEST FOR DISCLOSURE

Pursuant to Texas Rule of Civil Procedure 194, Landry's requests that, within 30 days of service of this request, ICSOP provide the information and materials described in Rule 194.2 of the Texas Rules of Civil Procedure.

Respectfully submitted,


_/s/ Micah E. Skidmore_
Micah E. Skidmore
State Bar No. 24046856
micah.skidmore@haynesboone.com
Natalie DuBose
State Bar No. 24077481
natalie.dubose@haynesboone.com

HAYNES AND BOONE, L.L.P.
2323 Victory Ave., Suite 700
Dallas, Texas 75219
Telephone:   (214) 651-5000
Telecopier:  (214) 651-5940

ATTORNEYS FOR PLAINTIFF
LANDRY'S INC.

4824-1303-0248 v.4

2018-45222 / Court: 234

# EXHIBIT A



**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

PAYMENTECH, LLC and JPMORGAN §
CHASE BANK, N.A., §
§
   *Plaintiffs* §
§
  v. §   Civil Action No. _____
§
LANDRY'S INC., as successor in interest to §
LANDRY'S MANAGEMENT, L.P., §
§
   *Defendant*. §

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

  Plaintiffs Paymentech, LLC ("Paymentech") and JPMorgan Chase Bank, N.A. ("JPMC") (collectively "Chase Paymentech") file this Original Complaint against Defendant Landry's Inc. ("Landry's"), as successor in interest to Landry's Management, L.P., and allege as follows:

## I. PARTIES

  1. Plaintiff JPMorgan Chase Bank, N.A. is a national banking association with its main office located in Columbus, Ohio. Accordingly, JPMorgan Chase Bank, N.A. is a citizen of Ohio.

  2. Plaintiff Paymentech, LLC is a Delaware limited liability company. The sole member of Paymentech, LLC is JPMorgan Chase Bank, N.A. Accordingly, Paymentech, LLC is a citizen of Ohio.

  3. Defendant Landry's Inc. is a Delaware corporation with its principal place of business in Houston, Harris County, Texas. Accordingly, Landry's Inc. is a citizen of Texas.

Exhibit B

## II. JURISDICTION AND VENUE

4.     This Court has subject-matter jurisdiction over this case because complete diversity of citizenship exists between Plaintiffs, who are citizens of Ohio, and Defendant, who is a citizen of Texas, and because Plaintiffs seek damages in excess of $75,000 exclusive of interest and costs. *See* 28 U.S.C. §§ 1332, 1441(b).

5.     Venue is proper in the Houston Division of the Southern District of Texas because Landry's Inc.'s principal place of business is in Harris County, Texas. 28 U.S.C. § 1391(b)(1). Venue is also proper based on Section 15.10 of the parties' Select Merchant Payment Card Processing Agreement, executed on or about December 31, 2008, and amended on or about December 2015 (collectively the "Agreement"). The Agreement is attached hereto as Exhibit A and incorporated as if fully set out herein.

### III.     FACTS

6.     This breach of contract case concerns Landry's refusal to indemnify Chase Paymentech after final assessments were imposed arising out of a significant data breach at numerous Landry's properties in several states from as early as May 2014 until December 2015. Despite the clear and unambiguous language of the contract between Landry's and Chase Paymentech, Landry's refuses to indemnify Chase Paymentech for these assessments, forcing Chase Paymentech to bring this lawsuit.

### A.  The Relationship Among the Parties

7.     JPMC is a national banking association that has membership agreements with credit card companies, including Visa, Inc. and MasterCard Incorporated (hereinafter referred to collectively as "Payment Brands"). Paymentech is the payment processing and merchant acquiring business of JPMC. Through JPMC, Paymentech authorizes payment card transactions with

various merchants by virtue of Merchant Payment Card Processing Agreements.

8.    Landry's is a merchant that operates several properties around the country, including restaurants, hotels and casinos. Landry's accepts Visa and MasterCard credit cards as a form of payment at its properties.

9.    In a typical payment card transaction, the customer presents his or her credit card to the merchant. The merchant's point of sale system sends the information to a payment processor (here, Paymentech), which then obtains an authorization from the payment or card brand (*e.g.,* Visa, Inc. or MasterCard, Inc.) and the bank that issued the customer's card (the issuer or the issuing bank). The funds are ultimately collected and sent to the merchant's bank (the acquiring bank, *e.g.*, JPMC).

B.    **The Agreement**

10.    On or about December 31, 2008, JPMC, the acquiring bank; Paymentech, the payment processor; and Landry's, the merchant; entered into a Select Merchant Payment Card Processing Agreement (the "Agreement"). *See* Ex. A. Pursuant to the Agreement, Chase Paymentech agreed to provide payment card processing services to Landry's for transactions that were processed at Landry's properties. In return, Landry's agreed to compensate Chase Paymentech for these services for an initial term of five years.

11.    Pursuant to the Agreement, Landry's agreed to abide by "all Payment Brand Rules," which includes the "bylaws, rules, and regulations, as they exist from time to time, of the Payment Brand Rules." Ex. A, Agreement, at §§ 1.3, 17. Included in the Payment Brand Rules, among other things, are Visa's Global Compromised Account Recovery ("GCAR") Program and MasterCard's Account Data Compromise ("ADC") Program. These programs are designed to address the needs of Payment Brand clients in the event of a large scale credit card data

compromise. In this regard, the Payment Brand Rules also require compliance with "Security Guidelines," that incorporate the Payment Card Industry Data Security Standards. *Id.* §§ 12, 17.

12.     In connection with Landry's contractual obligation to comply with the Payment Brand Rules and Security Guidelines, Landry's was also contractually obligated to indemnify Chase Paymentech for its failure to comply with the Payment Brand Rules that led to assessments, fines, or penalties by the Payment Brands. Indeed, as part of the bargained-for agreement, Landry's expressly agreed to indemnify or reimburse Chase Paymentech for any "assessment, fine, or penalty imposed on [Paymentech] or [JPMC] and any related loss, cost or expense incurred by [Paymentech] or [JPMC]" assessed by the Payment Brands as a result of Landry's **failure to comply with the Payment Brand Rules, including the Security Guidelines**, or the **compromise of any Payment Instrument Information**." Ex. A, Agreement, at § 12 (emphasis added).

13.     Landry's contractual obligation to indemnify Chase Paymentech for any assessments, fines or penalties was not conditioned upon any other events such as any determination that the assessments, fines, or penalties imposed by the Payment Brands were undisputed by Landry's or subsequently determined by Landry's to be legitimate. Instead, Landry's obligation to indemnify Chase Paymentech for any assessments, fines or penalties was triggered when the Payment Brands imposed assessments on Chase Paymentech as a result of their investigations into the Data Breach. *Id.* § 17 (emphasis added). Pursuant to the Agreement, this provision in Section 12 survived the termination of the Agreement. *See id.* § 16.

14.     On or about October 28, 2015, Landry's provided Notice of Termination of the Agreement in compliance with Section 10.1.

- 4 -
Exhibit B

### C. The Data Breach

15.     On or about December 2, 2015, Chase Paymentech discovered a credit card data compromise related to certain properties owned by Landry's (the "Data Breach").

16.     An investigation confirmed that a significant Data Breach occurred at numerous Landry's properties in several states during the following periods: May 4, 2014 through March 15, 2015; May 5, 2015 through December 3, 2015; and March 16, 2015 through May 4, 2015.  During the Data Breach, millions of credit card accounts were compromised at multiple Landry's properties across fourteen different merchant brands, such as Bubba Gump, McCormick & Schmick's, Rainforest Café, Saltgrass restaurants, among others (*i.e.*, Landry's Properties).

17.     In sum, the investigation confirmed that Landry's allowed cardholder account data to be put at risk as a result of the Data Breach.

18.     Landry's acknowledged the Data Breach in a December 17, 2015 press release where Landry's notified the public and its customers that it had received reports of unauthorized charges on certain payment cards and that it had begun an investigation into those reports. Landry's also stated that it was implementing enhanced payment system changes, both to the specific properties where the suspected activity occurred and the majority of its other properties, which would encrypt the credit card data throughout the processing system.  Landry's admitted that, although the investigation was ongoing, it appeared the information affected in the Data Breach included the data contained in the magnetic strip on the back of payment cards, such as a cardholder's name, card number, expiration date, and internal verification code.

19.     Indeed, following its investigation Landry's issued another press release on January 29, 2016, and confirmed that the Data Breach involved the installation of a program on payment processing devices at certain Landry's Properties.  According to Landry's, the program was

designed to search for data from the magnetic stripe of payment cards that had been swiped (*i.e.*, cardholder name, card number, expiration date and internal verification code) as the data was being routed through affected systems. The Data Breach impacted a number of Landry's Properties such as restaurants, food and beverage outlets, spas, and entertainment destinations for several months from approximately May 2014 until December 2015.

20. In sum, the Data Breach involved the compromise of Payment Instrument Information as defined by the Agreement, including but not limited to, the cardholder's name, card number, expiration date, and internal verification code.[1] Ex. A, Agreement, at § 17.

21. Later in December 2015, following the discovery of the Data Breach, the parties entered into an amendment to the Select Merchant Payment Card Processing Agreement, which revoked the previous Notice of Termination with respect to "Existing Merchants" only.[2]

### D. The Visa GCAR Program

22. As noted above, in connection with data breaches where credit card information is compromised, such as the one at issue here, Visa utilizes a Global Compromised Account Recovery ("GCAR") Program, which is designed to balance the needs of Visa clients in the event of a large scale card data compromise. The GCAR Program is designed to compensate issuing

---

[1] "Payment Instrument Information" is defined in the Agreement § 17 as:

> [P]ersonal information related to a Customer or the Customer's Payment Instrument, that is obtained by [Landry's] from the Customer's Payment Instrument, or from the Customer in connection with his or her use of a Payment Instrument (for example a security code, a PIN number, or the customer's zip code when provided as part of an address verification system). Without limiting the foregoing, such information may include a **Customer's name, Payment Instrument account number and expiration date**, date of birth, PIN data, security code data such as CVV2, CVC2, and any data read, scanned, **or otherwise obtained from the Payment Instrument, whether printed thereon, or magnetically, electronically or otherwise stored thereon.**

[2] On December 6, 2016, Landry's provided written notice to Chase Paymentech that it was terminating the amendment to the Agreement effective June 4, 2017 for reasons unrelated to the Data Breach.

banks—banks that issue credit cards—for a portion of costs associated with counterfeit magnetic-stripe losses and/or PIN data fraud losses, as well as a portion of the associated operating expenses resulting from the compromise. These costs include, but are not limited to, card replacement, recoupment of disputed charges, legal fees, and an increase in labor due to customer inquiries related to the compromise. The GCAR Program is included in the Payment Brand Rules that Landry's contractually agreed to abide by as part of its contract with Chase Paymentech.

23.     Pursuant to the terms of the GCAR Program, following a card data compromise, Visa first determines if the compromise meets the GCAR Event Qualification Criteria. If so, Visa calculates the merchant acquirer's liability (here, Chase Paymentech) pursuant to the rules of the GCAR program. Visa then notifies Chase Paymentech of the amount being assessed ("GCAR Assessment") and qualification details. Chase Paymentech, on behalf of the merchant, then may exercise appeal rights by submitting any appeal documents within 30 days of the qualification summary. Finally, Chase Paymentech is debited the amount of the GCAR Assessment approximately 30 days after notification of the completion of the appeal process.

24.     In accordance with the GCAR Program, Visa conducted an investigation and determined that the Data Breach qualified as a GCAR Event. Visa then calculated the total amount of liability for the Data Breach at $12,678,367.13, and issued a Qualification Notification of GCAR Assessment on July 15, 2017, informing Chase Paymentech that the Data Breach events met all the criteria set forth by the GCAR rules, and were therefore eligible for assessment.

25.     Upon receipt of the Qualification Notification of GCAR Assessment from Visa, on July 17, 2017, Chase Paymentech notified Landry's of the GCAR Assessment, informed Landry's of its appeal rights, and requested that Landry's reimburse Paymentech for the full amount within 30 days as required by the Agreement.

26.     On July 25, 2017, in direct contradiction to the terms of the Agreement, Landry's responded that it "disputes that it has any obligation to reimburse Paymentech, LLC ("Paymentech") for any amounts imposed and collected by Visa from JP Morgan Chase Bank ("Chase")." Landry's noted, however, that it believed Chase Paymentech had various grounds to appeal the GCAR Assessment and agreed to provide Chase Paymentech with information to use on its behalf in the appeal process.

27.     Although the appeal of the GCAR Assessment is filed by the acquirer, the merchant (here, Landry's) provides the substantive arguments to support the appeal of the GCAR Assessment. Accordingly, Landry's provided Chase Paymentech with the substantive arguments to use in Chase Paymentech's appeal of the Visa GCAR Assessment with the understanding that Chase Paymentech would merely file the appeal on Landry's behalf.

28.     On September 11, 2017, Chase Paymentech filed a GCAR Assessment appeal with Visa on behalf of Landry's, containing arguments, including among other things arguments challenging the validity of the assessments under the Payment Brand Rules and enclosing supporting documentation provided by counsel for Landry's.

29.     On December 15, 2017, Visa responded to the GCAR Assessment appeal filed by Chase Paymentech on behalf of Landry's. Based on information and belief, Visa staff determined that credit card data was compromised and that Landry's failed to comply with multiple Payment Card Industry Data Security Standards in connection with the Data Breach, and recommended that the Visa Appeal Committee deny Landry's appeal.

30.     Visa's Appeal Committee rejected Landry's arguments and denied Landry's appeal on January 31, 2018. The final amount assessed by Visa for Landry's Data Breach was $12,678,367.13, which included the original assessment $12,628,367.13 and an additional

$50,000.00 fee for the costs associated with the appeal. That amount was debited from Chase Paymentech in March 2018.

31.     The decision of Visa's Appeal Committee is final and terminates the GCAR process. The decision is not subject to further challenges or other appeal rights.

### E. The MasterCard ADC Program

32.     As noted above, MasterCard utilizes a program similar to Visa's GCAR Program called the Account Data Compromise ("ADC") Program. Like the Visa GCAR Program, the ADC Program is included in the Payment Brand Rules. Pursuant to the terms of the ADC Program, following a credit card data compromise, MasterCard first determines if the occurrence constitutes an ADC Event, which is defined as an occurrence that results, directly or indirectly, in the unauthorized access to or disclosure of MasterCard account data. If it does, MasterCard determines the total amount of acquirer liability, including the amount of Operational Reimbursement[3] and/or Fraud Recovery.[4] MasterCard then notifies the acquirer (here, Chase Paymentech) of the liability amount ("ADC Assessment") and qualification details. Chase Paymentech may then file an appeal within 30 days after receipt of the final notification. Finally, Chase Paymentech will be debited the amount of the ADC Assessment on the date specified in the final notification or in the appeal decision notification letter, if applicable. Landry's was contractually obligated to indemnify Chase Paymentech for the amount of liability assessed by MasterCard against Chase Paymentech.

33.     In accordance with the ADC Program, MasterCard conducted an investigation and

---

[3] The MasterCard Operational Reimbursement program enables an issuer to partially recover costs incurred in reissuing cards and for enhanced monitoring of compromised and/or potentially compromised MasterCard Accounts associated with an ADC Event.

[4] The MasterCard Fraud Recovery program enables an issuer to recover partial counterfeit fraud losses associated with an ADC Event.

determined that the Data Breach qualified as an ADC Event. MasterCard then calculated the total amount of liability for Operational Reimbursement and Fraud Recovery at $10,548,342.50, and issued a Notification of Account Data Compromise Event Responsibility and Final Acquirer Financial Responsibility Report on October 5, 2017.

34.     Upon receipt of the Notification of Account Data Compromise Event Responsibility from MasterCard, on October, 5, 2017, Chase Paymentech sent Landry's the Final Acquirer Financial Responsibility Report, informed Landry's of its appeal rights, and requested that Landry's reimburse Chase Paymentech for the full amount of the ADC Assessment within 30 days as required under the Agreement.

35.     On October 18, 2017, again in direct contradiction to the terms of the Agreement, Landry's responded that it "disputes that it has any obligation to indemnify JP Morgan Chase Bank, N.A. or Paymentech, LLC for the amount of any assessment MasterCard has elected to impose, whether under the Select Merchant Payment Card Processing Agreement between Landry's, Inc. as successor in interest to Landry's Management, L.P. and Paymentech, LLC for itself and on behalf of JP Morgan Chase Bank, N.A. (as amended, the "Agreement") or otherwise." Landry's noted, however, that it believed Chase Paymentech had various grounds to appeal the ADC Assessment and agreed to provide Chase Paymentech with information to use on its behalf in the appeal process.

36.     Like an appeal of the GCAR Assessment, the appeal of the ADC Assessment is filed by the acquirer, but the merchant (here, Landry's) provides the substantive arguments to support the appeal of the ADC Assessment. Accordingly, Landry's provided Chase Paymentech with the substantive arguments to use in Chase Paymentech's appeal of the ADC Assessment with the understanding that Chase Paymentech would merely file the appeal on Landry's behalf.

37.    On November 13, 2017, Chase Paymentech filed an ADC Assessment appeal on behalf of Landry's with MasterCard, containing arguments, including arguments challenging the validity of the assessments under Payment Brand Rules and enclosing supporting documentation provided by counsel for Landry's.

38.    On February 21, 2018, MasterCard responded to the ADC Assessment appeal filed by Chase Paymentech on behalf of Landry's.  Based on information and belief, MasterCard staff determined that Landry's failed to comply with multiple Payment Card Industry Data Security Standards in connection with the Data Breach, and that credit card data was compromised.

39.    MasterCard considered the "totality of the circumstances" and "determined that a reduction of Chase's total financial responsibility for this case in the amount of $3,164,502.75 is appropriate," pursuant to its Security Rules.  Thus, the total ADC Assessment that MasterCard determined in connection with the Data Breach was $7,383,839.75.  That amount was debited from Chase Paymentech in March 2018.

40.    The decision of MasterCard is final and terminates the ADC appeal process.  The decision is not subject to any further challenges or any other appeal rights.

**F.  Landry's Refusal to Reimburse Chase Paymentech**

41.    As noted above, Landry's had the opportunity to raise numerous arguments challenging the validity of the assessments in both the GCAR Assessment appeal to Visa and the ADC Assessment appeal to MasterCard.  After considering these arguments, the Payment Brands rejected them and denied Landry's appeals.  Under the GCAR and ADC rules, these decisions were final and not subject to further challenges or other appeal rights.

42.    Accordingly, the Payment Brands determined that the total amount to be assessed as a result of the Data Breach that occurred at restaurants and entertainment facilities owned or

operated by Landry's is $20,062,206.88: $12,678,367.13 for the Visa GCAR Assessment and $7,383,839.75 for the MasterCard ADC Assessment.  Under the explicit and unambiguous terms of the Agreement, Landry's is contractually obligated to indemnify Chase Paymentech for this amount, whether Landry's agreed with the assessments or not.  *See* Ex. A, Agreement, at § 12. Moreover, Landry's agreed to indemnify Chase Paymentech "from any losses, liabilities, and damages of any and every kind . . . arising out of any claim, complaint, or Chargeback . . . caused by [Landry's] noncompliance with this Agreement, the Operating Guide, or the Payment Brand Rules." *See id.* § 11.2.

43.     On March 23, 2018, Chase Paymentech sent Landry's a demand letter requesting that it indemnify Chase Paymentech for the $20,062,206.88 assessed by Visa and MasterCard and debited from Chase Paymentech in connection with the Data Breach.

44.     Despite its obligation under the Agreement, Landry's baldly refused to indemnify Chase Paymentech for the amounts assessed by the Payment Brands as a result of the Data Breach. Indeed, on April 23, 2018, Landry's informed Chase Paymentech that it did not have any obligation to indemnify Chase Paymentech for the GCAR or ADC Assessments.

45.     Because Landry's refuses to comply with its contractual obligations pursuant to the Agreement, Chase Paymentech is forced to file this Complaint.

### IV.     CAUSES OF ACTION

### Count I – Breach of Contract

46.     Chase Paymentech repeats and re-alleges the foregoing allegations of Paragraphs 1 through 45 as if fully set forth herein.

47.     The Agreement is a valid and enforceable agreement.

48.     Chase Paymentech fully performed in accordance with the terms of the Agreement.

49.     Pursuant to the Agreement, Landry's agreed to abide by the Payment Brand Rules, which include compliance with and participation in Visa's GCAR Program and MasterCard's ADC Program.  Ex. A, Agreement, at § 1.3.

50.     Also under the Agreement, Landry's was obligated to indemnify and reimburse Chase Paymentech for any assessments, fines, or penalties imposed on Chase Paymentech arising from the GCAR or ADC Programs.  Ex. A, Agreement, at § 12; *see also id.* § 11.2.

51.     This obligation to indemnify Chase Paymentech was not conditioned upon any determination that the assessments, fines, or penalties imposed by the Payment Brands were either undisputed or subsequently determined to be legitimate.  Nor was this obligation to indemnify Chase Paymentech conditioned upon whether Landry's agreed with the assessments or not.

52.     Visa and MasterCard determined that Landry's failed to comply with multiple Payment Card Industry Data Security Standards, and that Payment Instrument Information was compromised.  Indeed, Landry's has admitted that Payment Instrument Information (*i.e.*, cardholder names, card numbers, expiration dates, and internal verification codes) was compromised as a result of the Data Breach that occurred between May 2014 and December 2015.  Accordingly, under either contractual provision—failure to comply with the Payment Brand Rules **or** compromise of Payment Instrument Information—Landry's was obligated to indemnify and reimburse Chase Paymentech for any assessments, fines and penalties imposed on Chase Paymentech by the Payment Brands as a result of the Data Breach.  *See* Ex. A, Agreement, at § 12.

53.     Likewise, Landry's failure to comply with the Payment Card Industry Data Security Standards and, thus, the Payment Brand Rules, triggered Landry's obligation to indemnify Chase Paymentech for all "losses, liabilities, and damages of any and every kind," including the GCAR and ADC Assessments, "arising out of any claim, complaint, or Chargeback." *Id.* § 11.2.

54.     Landry's breached the Agreement by failing to pay Chase Paymentech the $20,062,206.88 assessed by the Payment Brands as a result of their investigations into the Data Breach.

55.     All notices and demands required by law or contract have been given or are given in this Complaint.

56.     As a result of this breach, Chase Paymentech has suffered damages in an amount in excess of the minimum jurisdictional limits of this Court.  Chase Paymentech seeks its actual damages from Landry's including, but not limited to, the $20,062,206.88 assessed and debited by the Payment Brands as a result of their investigations into the Data Breach, as well as any interest and costs allowed under law.

57.     Chase Paymentech also seeks its attorney's fees under Texas Civil Practice & Remedies Code § 38.001(8) and Sections 11 and 12 of the Agreement.  This action is found on written contract, and Chase Paymentech is therefore entitled to recover its reasonable attorney's fees incurred in addition to the amounts otherwise recoverable.  Chase Paymentech is represented by attorneys, and its claim was presented to Landry's more than thirty days prior to the trial of this action, and the just amount has not been tendered.

## Count II (In the Alternative) – Quantum Meruit

58.     Chase Paymentech repeats and re-alleges the foregoing allegations of Paragraphs 1 through 57 as if fully set forth herein.

59.     In the alternative to the breach of contract claim above, Chase Paymentech seeks to recover against Landry's under the theory of quantum meruit.  Chase Paymentech provided Landry's with payment card processing services that were beneficial for Landry's.  In connection with these services, Chase Paymentech was responsible for making the initial payment to the

Payment Brands in the event any assessments, fines, or penalties were issued by the Payment Brands resulting from Landry's failure to comply with the Payment Brand Rules, including the Security Guidelines, or the compromise of any Payment Instrument Information. Landry's bargained for and accepted these services provided by Chase Paymentech.

60.     In exchange for these services, Landry's promised to reimburse Chase Paymentech for any assessments, fines, or penalties imposed on Chase Paymentech by the Payment Brands resulting from Landry's failure to comply with the Payment Brand Rules, including the Security Guidelines, or the compromise of any Payment Instrument Information. Landry's was aware that Chase Paymentech expected to be reimbursed for any assessments, fines or penalties by the Payment Brands that Chase Paymentech paid as a result of a credit card data breach as part of the services provided to Landry's.

61.     Visa and MasterCard determined that Landry's failed to comply with the Payment Brand Rules, including the Security Guidelines, and that Payment Instrument Information, such as cardholder names, card numbers, expiration dates, and internal verification codes, was compromised in the Data Breach. Indeed, Landry's admitted that Payment Instrument Information was compromised.

62.     Following the Data Breach, Chase Paymentech provided Landry's with the GCAR and ADC Assessments issued by the Payment Brands resulting from the Data Breach. The GCAR and ADC Assessments were debited from Chase Paymentech in March 2018. Chase Paymentech requested that Landry's reimburse Chase Paymentech for its payment of the GCAR and ADC Assessments. Landry's failed to pay, and still refuses to pay.

63.     Chase Paymentech provided valuable services to Landry's pursuant to the Agreement, and Landry's has a contractual obligation to pay for these services. In the event Chase

Paymentech's breach of contract claim against Landry's should fail, Landry's will be unjustly enriched if Chase Paymentech is not reimbursed for the GCAR and ADC Assessments paid to Visa and MasterCard on behalf of Landry's as a result of the Data Breach.

64.     By the conduct alleged above, Landry's accepted services but refused to pay Chase Paymentech for those services, causing Chase Paymentech actual damages. Chase Paymentech is entitled to an award of $20,062,206.88, in addition to any interest and costs allowed under law.

65.     Chase Paymentech also seeks its attorney's fees under Texas Civil Practice & Remedies Code § 38.001(1). This action is found on services rendered, and Chase Paymentech is therefore entitled to recover its reasonable attorney's fees incurred in addition to the amounts otherwise recoverable.

### Count III (In the Alternative) – Promissory Estoppel

66.     Chase Paymentech repeats and re-alleges the foregoing allegations of Paragraphs 1 through 65 as if fully set forth herein.

67.     In the alternative to the breach of contract claim above, Chase Paymentech seeks to recover against Landry's under the theory of promissory estoppel. Landry's made a promise to Chase Paymentech that Landry's would reimburse Chase Paymentech for any assessments, fines, or penalties imposed by the Payment Brands on Chase Paymentech resulting from Landry's failure to comply with the Payment Brand Rules, including the Security Guidelines, or the compromise of any Payment Instrument Information that led to assessments by the Payment Brands.

68.     Visa's GCAR and MasterCard's ADC programs determined that Landry's failed to comply with the Payment Brand Rules, including the Security Guidelines, and that Payment Instrument Information was compromised. Indeed, Landry's has admitted that Payment Instrument Information was compromised as a result of the Data Breach.

69.     Chase Paymentech reasonably relied on Landry's promises and paid $20,062,206.88 to the Payment Brands for the GCAR and ADC Assessments resulting from the Data Breach, as Chase Paymentech was obligated to do pursuant to its contractual obligations to Visa and MasterCard.

70.     Chase Paymentech's reliance on Landry's promise to reimburse Chase Paymentech for any assessments, fines, or penalties imposed on Chase Paymentech resulting from Landry's failure to comply with the Payment Brand Rules, including the Security Guidelines, or the compromise of any Payment Instrument Information, was reasonable.

71.     As a direct and proximate result of Landry's broken promises, Chase Paymentech has suffered damages in the amount of $20,062,206.88. Chase Paymentech is entitled to an award of $20,062,206.88, in addition to any interest and costs allowed under law.

72.     Chase Paymentech is also entitled to recover its reasonable and necessary attorney's fees for its promissory estoppel claim. *See Corpus Christi Day Cruise, LLC v. Christus Spohn Health Sys. Corp.*, 398 S.W.3d 303, 314 (Tex. App.—Corpus Christi 2012, pet. denied).

73.     If Chase Paymentech's breach of contract claims against Landry's should fail, injustice can only be avoided by enforcing Landry's promise to reimburse Chase Paymentech for any assessments, fines, or penalties imposed on Chase Paymentech resulting from Landry's failure to comply with the Payment Brand Rules, including the Security Guidelines, or the compromise of any Payment Instrument Information.

## V.     CONDITIONS PRECEDENT

74.     All conditions precedent to Chase Paymentech's claims for relief have been performed or have occurred.

## VI.    TRIAL BY JURY WAIVED

75.     The parties have waived trial by jury with respect to this suit. *See* Ex. A, Agreement

§ 15.10.

## VII.    PRAYER

76.     WHEREFORE, Plaintiffs Chase Paymentech respectfully seek a judgment against

Defendant Landry's that includes the following relief:

    a.   Actual damages;

    b.   Pre-judgment and post-judgment interest;

    c.   Court costs;

    d.   Attorney's fees; and

    e.   All other relief to which Chase Paymentech is entitled.

Dated: May 17, 2018                            MORGAN, LEWIS & BOCKIUS LLP

By:  */s/ David Levy*
David Levy
Attorney-in-Charge
Texas Bar No.: 12264850
S.D. Tex. ID No.: 13725
david.levy@morganlewis.com
Mary Susan Formby
Texas Bar No.: 24083011
S.D. Tex. ID No.: 2292403
marysusan.formby@morganlewis.com
1000 Louisiana Street, Suite 4000
Houston, Texas 77002
(713) 890-5000 Telephone
(713) 890-5001 Facsimile

ATTORNEYS FOR PLAINTIFFS
PAYMENTECH, LLC AND JPMORGAN
CHASE BANK, N.A.

Unofficial Copy Office of Chris Daniel District Clerk

Unofficial Copy Office of Chris Daniel District Clerk

# EXHIBIT A

01/09/2009 07:34 FAX  214 849      4      CHASE PAYMENTECH                    ☒001/011



## CHASE Paymentech

### SELECT MERCHANT PAYMENT CARD PROCESSING AGREEMENT

THIS SELECT MERCHANT PAYMENT CARD PROCESSING AGREEMENT (the "Agreement") is dated as of the Effective Date, among Paymentech, LLC, a Delaware limited liability company ("Paymentech", "we", or "us"), JPMorgan Chase Bank, N.A., a national banking association ("Member"), and Landry's Management, LP, a _____ limited partnership ("Merchant", "you", or "your").

WHEREAS Member is a member of several Payment Brands and, through Member, Paymentech is authorized to process all Transactions listed on Schedule A; and
WHEREAS Merchant wishes to accept Payment Instruments from its customers for the sale or lease of goods or services offered by Merchant;
ACCORDINGLY, in consideration of the mutual promises made and the mutual benefits to be derived from this Agreement, Paymentech, Member, and Merchant agree to the following terms and conditions intending to be legally bound:

### 1. MERCHANT'S ACCEPTANCE OF PAYMENT INSTRUMENTS

**1.1 Exclusivity.** Except in the instance where you acquire another entity which has an agreement with another third party to utilize an alternative payment processing system, you will tender to us Transaction Data generated from all your US Transactions via electronic data transmission according to our formats and procedures. In addition, you agree that upon the expiration of the then-current term of any such previous agreement between your acquired entity and another third party provider, you will convert such payment processing transactions to us for the remaining term of this Agreement. You will not use the services of any bank, corporation, entity, or person other than Paymentech for authorization or processing of Transactions throughout the term of this Agreement, except for your divisions, products, or business lines specified in your account application or for which we otherwise agree in writing not to process.

**1.2 Certain Payment Acceptance Policies.** Each Payment Transaction and Conveyed Transaction must be evidenced by a single Transaction Data record completed with (i) the transaction date; (ii) a brief description of the goods or services sold, returned, or canceled; (iii) the price of the goods or services, including applicable taxes, or amount of any credit or adjustment; (iv) the Customer name; (v) your name in a manner recognizable to Customers; (vi) your address; (vii) a customer service telephone number; (viii) any applicable terms and conditions; (ix) the exact date any free trials end; and (x) any other information which the applicable Payment Brand may require. You shall not impose any surcharge or finance charge on the Transaction or otherwise require the Customer to pay the fees payable by you under this Agreement if prohibited by the applicable Payment Brand. You shall not engage in any practice that unfavorably discriminates against or provides unequal treatment of the use of any Payment Brand over any other Payment Brand. You shall not set a dollar amount above or below which you refuse to honor otherwise valid Payment Instruments in violation of Payment Brand Rules. With respect to any Payment Transaction or Conveyed Transaction for which a Payment Instrument is not physically presented, such as in any on-line, mail, telephone, or pre-authorized transaction, you must (i) have notified us on your application or otherwise in writing of your intention to conduct such Transactions and secured our agreement to accept them; and (ii) have reasonable procedures in place to ensure that each Transaction is made to a purchaser who actually is the Customer. Notwithstanding the foregoing, you acknowledge that under certain Payment Brand Rules, you cannot rebut a Chargeback where the Customer disputes making the purchase without an electronic record (for example, "swiping", or "tapping" a Payment Instrument) or physical imprint of the Payment Instrument.

**1.3 Operating Guide; Payment Brand Rules.** You agree to comply with the operating guide attached to this Agreement, as amended from time to time ("Operating Guide"), and all Payment Brand Rules as may be applicable to you and in effect from time to time as published (on a website or otherwise) by any Payment Brand or of which you have been otherwise informed, and such other procedures as we may from time to time prescribe for the creation or transmission of Transaction Data. We may modify and supplement the Operating Guide in order to comply with requirements imposed by the Payment Brand Rules. You acknowledge that you have received a copy of the Operating Guide at or prior to your execution of this Agreement, and that you can also view the Operating Guide on-line at the Paymentech website, www.chasepaymentech.com/selmerchsource.do. To the extent that the Operating Guide is inconsistent with the Payment Brand Rules, the Payment Brand Rules shall prevail.

**1.4 Requirements for Certain Transactions.** As to all Payment Transactions and Conveyed Transactions you tender to us for processing, you represent and warrant that, to the best of your knowledge:
(1) The Transaction Data represents payment or refund of payment, for the bona fide sale or lease of the goods, services, or both, which you have provided in the ordinary course of your business, and the Transaction Data is not submitted on behalf of a third party.
(2) The Transaction Data represents an obligation of the Customer for the amount of the Transaction.
(3) The Transaction Data does not involve any element of credit for payment of a previously dishonored Payment Instrument or for any other purpose except payment for a current transaction and, except in the case of approved installment or pre-payment plans, the goods have been shipped or services actually rendered to the Customer.
(4) The Transaction Data is free from any material alteration not authorized by the Customer.
(5) The amount charged for the Transaction is not subject to any dispute, setoff, or counterclaim.
(6) Neither you nor your employee has advanced any cash to the Customer (except as authorized by the Payment Brand Rules) or to yourself or to any of your representatives, agents, or employees in connection with the Transaction, nor have you accepted payment for effecting credits to a Customer.
(7) The goods or services related to each Transaction are your sole property and you are free to sell them.
(8) You have made no representations or agreements for the issuance of refunds except as it states in your return/cancellation policy, which has been previously submitted to us in writing as provided in Section 3.
(9) Any credit transaction submitted to us represents a refund or adjustment to a Transaction previously submitted to Paymentech.
(10) You have no knowledge or notice of information that would lead you to believe that the enforceability or collectibility of the subject Transaction Data is in any manner impaired. The Transaction Data is in compliance with all applicable laws, ordinances, and regulations. You have originated the Transaction Data in compliance with this Agreement and any applicable Payment Brand Rules.
(11) For a Transaction where the Customer pays in installments or on a deferred payment plan, a Transaction Data record has been prepared separately for each installment transaction or deferred payment on the date(s) the Customer agreed to be charged. All installments and deferred payments, whether or not they have been submitted to us for processing, shall be deemed to be a part of the original Transaction.
(12) You have not submitted any Payment Transaction that you know or should have known to be either fraudulent or not authorized by the Customer or otherwise in violation of any provision of this Agreement or Payment Brand Rules.

### 2. AUTHORIZATIONS

**2.1 Obtaining Authorizations.** You are required to obtain authorization/approval codes through Paymentech, in accordance with this Agreement, for all Payment Transactions. You acknowledge that authorization/approval code of a Payment Transaction indicates only (i) that the Payment Instrument contains a valid account number; and (ii) that sufficient balance is available for the Payment Transaction at the time the authorization is given, but it does not constitute a representation from us, a Payment Brand or a card issuing bank that a particular Transaction is in fact a valid or undisputed transaction entered into by the actual Customer.

**2.2 Lack of Authorization.** We reserve the right to refuse to process any Transaction Data presented by you (i) unless a proper authorization/approval code is recorded, (ii) if we reasonably determine that the Transaction Data is or will become uncollectible from the Customer to which the transaction would otherwise be charged, or (iii) if we determine that the Transaction Data was prepared in violation of any provision of this Agreement or the Payment Brand Rules.

### 3. REFUNDS AND ADJUSTMENTS

**3.1 Disclosure of Refund Policy.** You are required to maintain a fair policy with regard to the return/cancellation of merchandise or services and adjustment of Transactions. You are required to disclose your return/cancellation policy to us on your application. Your return/cancellation policy must be disclosed to your customers.
**3.2 Changes to Policy.** Any change to your return/cancellation policy must be submitted to us, in writing, not less than 14 days prior to the effective date of such change. We reserve the right to refuse to process any Transaction Data made subject to a revised return/cancellation policy of which we have not been notified in advance.
**3.3 Procedure for Refunds/Adjustments.** If you allow a price adjustment, return of merchandise, or cancellation of services in connection with a Payment Transaction, you will prepare and deliver to us Transaction Data reflecting such refund/adjustment within 3 days of receiving the Customer's request for such refund/adjustment. The amount of the refund/adjustment cannot exceed the amount shown as the total on the original Transaction Data except by the exact amount required to reimburse the Customer for postage that the Customer paid to return merchandise. You are not allowed to accept cash or any other payment or consideration from a Customer to return for

preparing a refund to be deposited to the Customer's account; nor may you give cash refunds to a Customer in connection with a Payment Transaction, unless permitted or required by law.

### 4. SETTLEMENT.

**4.1 Submission of Transaction Data.** You are required to transmit your Transaction Data to us no later than the next business day immediately following the day that such Transaction Data is originated. Failure to do so can result in higher interchange fees and other costs and increased Chargebacks. For debit card transactions that are credits to a Customer's account, you agree to transmit such Transaction Data to us within 24 hours of receiving the authorization for such credit. Unless otherwise indicated on Schedule A, you will be solely responsible for all communication expenses required to facilitate the transmission of all Transaction Data to us.

**4.2 Merchant's Settlement Account.** In order to receive funds from Paymentech, you must maintain an account at a bank that is a member of the Automated Clearing House ("ACH") system of the Federal Reserve wire system ("Settlement Account"). During the term of this Agreement, and thereafter until we notify you that all monies due from you under this Agreement have been paid in full, you agree not to close your Settlement Account without giving us at least 5 days' prior written notice and substituting another Settlement Account. You are solely liable for all fees and costs associated with your Settlement Account and for all such monies. You authorize Paymentech to initiate electronic credit and debit entries and adjustments to your Settlement Account at any time without regard to the source of any monies in the Settlement Account. This authority will remain in full force and effect until we notify you that all monies due from you under this Agreement have been paid in full. We will not be liable for any delays in receipt of funds or errors in Settlement Account entries caused by third parties, including but not limited to delays or errors by the Payment Brands or your bank.

**4.3 Conveyed Transactions.** To the extent that you submit any Conveyed Transactions for processing by Paymentech and you do not have a valid agreement in effect with the applicable Payment Brand, you hereby authorize us, at our option, to submit such transaction to the applicable Payment Brand to settle such Conveyed Transactions from your Merchant Application as may be required in order to approve your acceptance of such Payment Instrument as method(s) of payment. Subject to such approval, you agree to the applicable Payment Brand's standard terms and conditions with respect to such method(s) of payment. Upon your transmission of such Conveyed Transactions to us, we will forward the Conveyed Transaction to the appropriate Payment Brand. Payment of the proceeds due you will be governed by whatever agreement you have with that Payment Brand, and we do not bear any responsibility for their performance. If your agreement with a Payment Brand requires the Payment Brand's consent for us to perform the services contemplated by this Agreement, you are responsible for obtaining that consent.

**4.4 Transfer of Settlement Funds.** For all Payment Transactions, we will process your Transaction Data to facilitate the funds transfer between the various Payment Brands and you. Promptly after we receive credit for each Transaction Data, we will provide provisional credit to your Settlement Account for the proceeds. The proceeds payable to you shall be equal to the amounts received by us in connection with your Transaction Data minus the sum of the following: (i) all fees, imposed by us or any third parties passed through to you, charges, and discounts set forth in Schedule A; (ii) all adjustments and Chargebacks; (iii) all equipment charges (if any); (iv) all Customer refunds, returns and adjustments; (v) all Reserve Account amounts; and (vi) any fees, charges, fines, assessments, penalties, or other liabilities that may be imposed on us or the Member from time to time by the Payment Brands and all related costs and expenses incurred by us. You agree that amounts set forth above, and any other amounts are due and payable by you at the time the related services are rendered to you; that all Reserve Account amounts are due and payable by you upon establishment; and that the related Chargebacks, Customer refunds, and adjustments, fees, charges, fines, assessments, penalties, and all other liabilities are due and payable by you when we receive notice thereof from the Payment Brands or otherwise pursuant to Section 4 herein. To the event we do not deduct such amounts from the proceeds payable to you, you agree to pay all such amounts to us. Alternatively, at our option, we may debit the Settlement Account for such amounts. Without limiting the foregoing or our rights under Section 7.2 or Section 10, if a Payment Brand notifies us or the Member that it intends to impose any fine or penalty as a result of excessive Chargebacks or your acts or omissions (including, without limitation, your failure to fully comply with any Payment Brand Rules), we may suspend the processing of your Payment Transactions.

**4.5 Negative Amounts.** To the extent the proceeds from Payment Transactions, we will represent positive credits or the Settlement Account does not have a sufficient balance to pay amounts due or reasonably anticipated to become due under this Agreement, we may pursue one or more of the following options: (i) demand and receive immediate payment for such amounts; (ii) debit your Settlement Account for the amount of the negative balance; (iii) withhold your settlement payments until all amounts are paid; (iv) delay presentation of your refunds until you make a payment to us of a sufficient amount to cover the negative balance; and (v) pursue any other remedies we may have at law or in equity. Furthermore, if the amount represented by your Transaction Data at any day is negative due to refunds or credits being submitted by you in excess of your proceeds from Transactions, you shall provide us with sufficient funds prior to the submission of the Transaction Data so as to prevent the occurrence of a negative balance.

**4.6 Delinquency/Merchant Fraud.** If: (i) there is a material, adverse change in your financial condition or your payment record with creditors; (ii) you are in material default of this Agreement; (iii) you change your billing practice in relation to shipment of merchandise or fulfillment of service or change refund procedures currently in place, and you fail to notify us in advance; (iv) you are receiving excessive Chargebacks (as defined in Section 7.3 below); (v) you significantly alter the nature of your business or product lines; or (vi) we have reasonable grounds to believe that we may become liable to third parties for the provision of credit extended to you or that you may be liable to your Customers, Payment Instrument issuing banks or the Payment Brands, or (vii) we have reasonable grounds to believe we may be subject to any additional liabilities, including, without limitation, any fines, fees, or penalties assessed against us by any of the Payment Brands, arising out of or relating to your Payment Transactions, your Chargebacks, or your failure to comply with this Agreement, any of the Payment Brand Rules, the Operating Guide, or the Security Guidelines (as defined in Section 12), we may temporarily suspend or delay payments to you during our investigation of the issue and/or designate an amount of funds that we must maintain in order to protect us against the risk of, among other things, existing, potential, or anticipated Chargebacks and to satisfy your other obligations under this Agreement (such funds being hereinafter referred to as the "Reserve Account," which may be funded in the same manner as provided for negative balances in Section 4.5. The Reserve Account will contain sufficient funds to cover any unbilled processing costs plus our estimated exposure based on reasonable criteria for Chargebacks, returns, unshipped merchandise and/or unfulfilled services, and all additional liabilities anticipated under this Agreement. We may (but are not required to) apply funds in the Reserve Account toward, and set off any funds that would otherwise be payable to you against, the satisfaction of any amounts which are or become due from you pursuant to this Agreement. The Reserve Account will be held and controlled by Paymentech, will not bear interest, and you will have no legal right or interest in the funds in the Reserve Account; provided, however, that upon satisfaction of all of your obligations under this Agreement, we will pay to you any funds then remaining in the Reserve Account. Any funds in the Reserve Account may be commingled with other funds, and need not be maintained in a separate account. Effective upon our establishment of a Reserve Account, you irrevocably grant to us a security interest in any interest you may now have or later acquire in any and all funds, together with the proceeds thereof, that may at any time be in our possession and would otherwise be payable to you pursuant to the terms of this Agreement. You agree to execute and deliver to us such instruments and documents (including, without limitation, security agreements and releases) that we may reasonably request (i) to perfect and confirm the security interest and right of setoff set forth in this Agreement; and (ii) in connection with any return of Reserve Account funds.

### 5. ACCOUNTING.

We will supply a detailed statement reflecting the activity for your merchant account(s) by online access (or otherwise if agreed to by both parties). We will not be responsible for any error that you do not bring to our attention within 90 days from the date of such statement.

### 6. RETRIEVAL REQUESTS.

**6.1 Records.** You agree to store original documentation or legible copies of each Transaction for at least 18 months from the date of such Transaction. You may not charge a fee to your Customers for the creation or storage of such copies. We may, at our discretion, require you to deliver copies of Transaction Data to us rather than storing it.

**6.2 Response to Retrieval Requests.** We will send you any Retrieval Request that we cannot satisfy with the information we have on file concerning any Payment Transaction. In response, you must provide us, in writing by certified or overnight mail or by confirmed fax (or by other means as agreed to by Paymentech), the resolution of your investigation of such Retrieval Request and include legible copies of any documentation required by the Retrieval Request within 7 business days after we send it to you (or such shorter time as the Payment Brand Rules may require). You acknowledge that your failure to fulfill a Retrieval Request in accordance with Payment Brand Rules may result in an irreversible Chargeback.

### 7. CHARGEBACKS.

**7.1 Chargeback Reasons.** You may receive a Chargeback from a Customer or Payment Brand for a number of reasons under the Payment Brand Rules. The following are some of the most common reasons for Chargebacks, and in no way is this intended to be an exhaustive list of possible Chargeback reasons:

(1) Your failure to issue a refund to a Customer upon the return or non-delivery of goods or services.

(2) A required authorization/approval code was not obtained.

(3) The Transaction Data was prepared incorrectly or fraudulently.

(4) We did not receive your response to a Retrieval Request within 7 business days or any shorter time period required by the Payment Brand Rules.

(5) The Customer disputes the Transaction or the authenticity of the signature on the Transaction Data or Payment Instrument, or claims that the Transaction is subject to a set-off, defense, or counterclaim.

(6) The Customer refuses to make payment for a Transaction because in the Customer's good faith opinion, a claim or complaint has not been resolved, or has been resolved in an unsatisfactory manner.

May 2008

Exhibit B

(7) The credit or debit card comprising the Payment Instrument was not actually presented at the time of the Payment Transaction or you failed to obtain an electronic record or physical imprint of such Payment Instrument, and the Customer denies making the purchase. The Merchant acknowledges that, under these circumstances, the fact that an authorization/approval code was obtained does not mean that a particular Transaction is valid or undisputed transaction is cleared into by the actual Customer.

7.2 Excessive Chargebacks. If you are receiving an excessive amount of Chargebacks, as determined by us from time to time, in addition to our other remedies under this Agreement we may take the following actions: (i) review your internal procedures relating to acceptance of Payment Instruments and notify you of new procedures you could adopt in order to avoid future Chargebacks; (ii) notify you of a new rate we will charge you to process your Chargebacks; (iii) collect from you (pursuant to Section 4.6) an amount reasonably determined by us to be sufficient to cover anticipated Chargebacks and all related fees, expenses, and fines; or (iv) terminate the Agreement with written notice of termination. You also agree to pay any and all Payment Brand fees and fines assessed against you, Paymentech, and/or Member relating to your violation of this Agreement, the Operating Guide, or the Payment Brand Rules with respect to your acceptance of Payment Instruments, your Transactions or with respect to excessive Chargebacks under this Section.

7.3 Claims of Customers. You have full liability if any Transaction, for which we have given your Settlement Account proceeds and credit, is the subject of a Chargeback. Subsequently, you may resubmit applicable Transaction Data for a second presentment, but only in accordance with Payment Brand Rules. To the extent that we have paid or may be called upon to pay a Chargeback, refund or adjustment for or on the account of a Customer and you do not reimburse us as provided for in this Agreement, then for the purpose of our obtaining reimbursement of such sums paid or anticipated to be paid, we have all of the rights and remedies of such Customer under applicable federal, state, or local laws and you authorize us to assert any and all such claims in our own name for and on behalf of any such Customer individually or all such Customers as a class.

**8.  DISPLAY OF PAYMENT BRAND MARKS.** Merchant is prohibited from using the Payment Brand Marks, as defined below (sometimes referred to herein as "Marks"), other than as expressly authorized by us in writing or by the Payment Brands. Payment Brand Marks mean the brands, emblems, trademarks, and/or logos that identify a Payment Brand. Additionally, Merchant shall not use the Payment Brand Marks other than to display decals, signage, advertising and other forms depicting the Payment Brand Marks that are provided to Merchant (i) by the Payment Brands; (ii) by us pursuant to this Agreement; or (iii) as otherwise approved in writing by us. Merchant may use the Payment Brand Marks only to promote the services covered by the Marks by using them on decals, indoor and outdoor signs, advertising materials and marketing materials; provided, that all such uses by Merchant must be in writing and approved by us and consistent with Payment Brand Rules. Merchant shall not use the Payment Brand Marks in such a way that Customers could believe that the products or services offered by Merchant are sponsored or guaranteed by the owners of the Payment Brand Marks. Merchant recognizes that it has no ownership rights in the Payment Brand Marks. Merchant shall not assign to any third party the rights to use the Payment Brand Marks. Merchant's subscense to use the Payment Brand Marks hereafter terminates simultaneously with the termination of this Agreement.

**9.  Fees.**

9.1 Schedule A. You agree to pay us for the services as set forth in Schedule A in accordance with this Agreement. Unless otherwise expressly stated in Schedule A, your pricing is based on all Transactions qualifying under the Payment Brand Rules for the lowest Payment Brand Interchange rates. For Transactions that do not qualify for the best rate, the Payment Brands may dictate that the Transaction is subject to a "downgrade", which will result in us charging you a higher rate than the qualified rate shown on Schedule A. Fees payable under this Agreement that contain a fraction of a cent will be rounded up to the next full cent.

9.2 Price Changes. You acknowledge that your pricing is based on your annual volume of Transactions, method of processing, type of business, and interchange qualification criteria as represented to us in your Application and restated on Schedule A. To the extent your actual volumes, method, type, and criteria differ from this information, we may modify the pricing on Schedule A with 30 days' prior written notice. In addition, we may change our fees, charges, and discounts resulting from (i) changes in Payment Brand fees (such as interchange, assessments, and other charges); (ii) changes in pricing by any third party provider of a product or service used by you; or (iii) fees which are added by a Payment Brand or card issuer. Such new prices will be applicable to you as of the effective date established by the Payment Brand or third party provider.

**10.  TERMINATION.**

10.1 Term. This Agreement takes effect upon our acceptance hereof as evidenced by our acceptance of your first Transaction for processing hereunder, and has an initial term expiring 5 years from that date. Unless otherwise terminated by either party as provided in this Agreement, this Agreement will automatically extend for successive one month terms. Either party may give notice of non-renewal of this Agreement by giving no more than 90 days and no less than 30 days prior to any expiration date.

10.2 Termination for Cause. If our services provided under this Agreement fail to conform to generally accepted standards for such services in the payment processing industry, your sole remedy for such failure shall be that upon notice from you specifying the failure of performance, we will rectify such failure of performance. If we do not rectify our failure of performance within 30 days after receipt of notification, you may terminate this Agreement upon 30 days' written notice to us. If you terminate the Agreement prior to the expiration of the term other than as a result of our material breach of this Agreement, in order to compensate us for our lost revenue, you agree to pay as liquidated damages the lesser of (a) an amount equal to the fees (net of Payment Brand interchange, assessments, and fines) that Paymentech would have received during the months remaining in the term of the Agreement based upon your representations contained in your Application and Schedule A, or (b) if we have at such time been processing all of your Transaction Data for at least 6 consecutive months, an amount calculated by multiplying the average monthly fees (net of Payment Brand interchange, assessments and fines) from the immediately preceding 6 months by the number of months remaining in the term of the Agreement. Such amount will be funded, to the extent possible, according to the same methods for collecting amounts due under Section 4.6 of this Agreement. We may terminate this Agreement at any time upon written notice to you as a result of any of the following events: (i) any noncompliance with this Agreement, the Payment Brand Rules, or the Operating Guide, which is not cured within 30 days of our notice to you, except as otherwise provided in this Agreement and except that no cure period is allowed for termination based on Merchant fraud or failure to fund a Reserve Account; (ii) any voluntary or involuntary bankruptcy or insolvency proceeding involving you; (iii) Paye entach deems you to be financially insecure; (iv) you or any person owning or controlling your business is or becomes listed in the MATCH file (Member Alert to Control High-Risk Merchants) maintained by Visa and MasterCard or any Payment Brand notifies us that it is no longer willing to accept your Transaction Data; or (v) for a period of more than 60 consecutive days, you do not transmit Transaction Data to us.

10.3 Account Activity After Termination. Termination does not affect either party's respective rights and obligations under this Agreement as to Transaction Data submitted before termination. If you submit Transaction Data to us after the date of termination, we may, at our sole discretion and without waiving any of our rights or remedies under this Agreement, process such Transaction Data in accordance with all of the terms of this Agreement. Upon notice of termination of this Agreement, we may estimate the aggregate dollar amount of Chargebacks and other obligations, liabilities and expenses that we reasonably anticipate subsequent to termination, and you agree to immediately deposit such amount in your Settlement Account or as otherwise directed by us, or we may withhold such amount from your settlement funds, in order to establish a Reserve Account pursuant to and governed by the terms and conditions of this Agreement.

**11.  INDEMNIFICATION.**

11.1 Paymentech. We agree to indemnify you and your affiliates, officers, directors, employees, and agents from any losses, abilities, and damages of any and every kind (including, without limitation, your costs, expenses, and reasonable attorneys' fees) arising out of any Customer complaint or Chargeback related to (i) any failure by us to properly safeguard the Customer's account information, (ii) our failure to deliver funds processed by us in accordance with Section 4.4 herein (which relates to payments due from us for Transaction Data), or (iii) any voluntary or involuntary bankruptcy or insolvency proceeding by or against us. This indemnification does not apply to any claim or complaint relating to your failure to resolve a payment dispute concerning merchandise or services sold by you or your negligence or willful misconduct. The indemnification provided under this Section 11.1 shall survive the termination of this Agreement.

11.2 Merchant. You agree to indemnify Paymentech, Member, the Payment Brands, and their respective affiliates, officers, directors, employees, agents, and sponsoring banks from any losses, liabilities, and damages of any and every kind (including, without limitation, our costs, expenses and reasonable attorneys' fees) arising out of any claim, complaint, or Chargeback (i) made or claimed by a Customer with respect to any Transaction or Transaction Data submitted by you, (ii) caused by your noncompliance with this Agreement, the Operating Guide, or the Payment Brand Rules, including any breach of a representation or warranty made by you, (iii) resulting from any voluntary or involuntary bankruptcy or insolvency proceeding by or against you, or (iv) related to your placement or the placement of any person owning or controlling your business in the MATCH files maintained by Visa and MasterCard. The indemnification provided for in this Section does not apply to any claim or complaint to the extent it is caused by Paymentech's own negligence or willful misconduct. The indemnification provided under this Section 11.2 shall survive the termination of this Agreement.

**12.  NO DISCLOSURE OF CUSTOMER INFORMATION.** You will exercise reasonable care to prevent disclosure or use of Payment Instrument Information, other than (i) to your agents and contractors for the purpose of assisting you in completing a Payment Transaction, (ii) to the applicable Payment Brand, or (iii) as specifically required by law.

You are allowed by the Payment Brand Rules to store only certain Payment Instrument Information (the "Permitted Information") currently linked to the customer's name, Payment Instrument account number and expiration date) and are prohibited from storing additional Payment Instrument Information, including, without limitation, any

May 2008

Exhibit B

security code data such as CVV2, CVC2, and PIN data, and any magnetic stripe track data. You will store all media containing Permitted Information in an unreadable format wherever it is stored and in an area limited to selected personnel on a "need to know" basis only and prior to either party discarding any material containing Payment Instrument Information, the party will destroy it in a manner rendering the account numbers unreadable. If at any time you determine that Payment Instrument Information has been compromised you will notify Paymentech immediately and assist in providing notification to such parties as may be required by law, by Payment Brand Rules, or as we otherwise reasonably deem necessary. Merchant Information may be shared by us with our affiliates and with the Payment Brands subject to the provisions of this Agreement and Payment Brand Rules.

You agree to comply with all data security standards, guidelines and requirements that may be published from time to time by any Payment Brand, including, without limitation, the Payment Card Industry Data Security Standards (collectively, the "Security Guidelines"). You further agree provide us upon our request with tests, scans and assessments of your compliance with Security Guidelines as required by the Payment Brands.

You must notify us of your use of any Service Provider and, to the extent required by each Payment Brand all Service Providers must be (i) compliant with all Security Guidelines applicable to Service Providers, and (ii) registered with and/or recognized by such Payment Brand(s) as being so compliant. You agree to exercise reasonable due diligence to ensure that all of your Service Providers, and any other agents, business partners, contractors, or subcontractors with access to Payment Instrument Information, maintain compliance with the Security Guidelines. To the extent required by each Payment Brand, all payment applications, or software involved in the processing, storing, receiving or transmittal of Payment Instrument Information, shall be (i) compliant with all Security Guidelines applicable to such payment applications or software, and (ii) registered with and/or recognized by such Payment Brand(s) as being so compliant. You understand that your failure to comply with the Payment Brand Rules, including the Security Guidelines, or the compromise of any Payment Instrument Information, may result in assessments, fines, and/or penalties by the Payment Brands, and you agree to indemnify and reimburse us immediately for any such assessment, fine, or penalty imposed on us or the Member and any related fees, cost or expense incurred by us or the Member. If any Payment Brand requires a forensic examination of you or any of your Service Providers, agents, business partners, contractors, or subcontractors due to a data security compromise event or suspected event, you agree to cooperate with such forensic examination (including, without limitation, the engagement of an examiner acceptable to the relevant Payment Brand) and agree to pay for all costs and expenses related to such forensic examination, including all of our attorneys' fees and other costs relating to such forensic examination.

### 13. INFORMATION ABOUT MERCHANT'S BUSINESS.
**13.1 Additional Financial Information.** You agree to furnish to us within five days of our request (i) your most recently prepared financial statements and credit information and (ii) if applicable, your three most recent filings with the SEC.
**13.2 Other Information.** With prior notice and during your normal business hours, our duly authorized representatives may visit your business premises and may examine your books and records that pertain to your Transaction Data or your compliance with this Agreement. You agree to provide us at least 30 days' prior written notice of your intent to change your product line or services, or your trade name, or the manner in which you accept Payment Instruments. If we determine such a change is material to our relationship with you, we may refuse to process Transaction Data made subsequent to the change. You agree to provide us with prompt written notice if you are the subject of any voluntary or involuntary bankruptcy or insolvency petition or proceeding.

### 14. DISCLAIMER; LIMITATION OF DAMAGES.
Subject to Section 5, we will, at our own expense, correct any Transaction Data to the extent that such errors have been caused by us or by malfunctions of our processing systems. Under no circumstances will Paymentech's financial responsibility for our failure of performance under this Agreement exceed the total fees paid to us under this Agreement (net of Payment Brand fees, third party fees, interchange, assessments and fines) for the six months prior to the time the liability arose. EXCEPT AS OTHERWISE PROVIDED FOR IN THIS AGREEMENT, IN NO EVENT WILL ANY PARTY, ITS RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, OR AFFILIATES, BE LIABLE FOR SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES OR ANY LOSS, THEFT, DISAPPEARANCE, OR DAMAGE TO DATA TRANSMITTED ELECTRONICALLY IN CONNECTION WITH THIS AGREEMENT. WHILE ALL PARTIES ACKNOWLEDGE THAT THIS IS AN AGREEMENT FOR SERVICES TO WHICH THE UNIFORM COMMERCIAL CODE DOES NOT APPLY, PAYMENTECH AND MEMBER HEREBY DISCLAIM ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, MADE TO MERCHANT OR ANY OTHER PERSON, REGARDING QUALITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE (REGARDLESS OF ANY COURSE OF DEALING, CUSTOM, OR USAGE OF TRADE) OF ANY SERVICES PROVIDED UNDER THIS AGREEMENT OR ANY GOODS PROVIDED INCIDENTAL TO SUCH SERVICES.

### 15. MISCELLANEOUS.
**15.1 Taxes.** Unless you are otherwise exempt, you agree to pay any taxes imposed on the services, equipment, intellectual property, supplies, and other goods purchased or tangible property provided under this Agreement, and you authorize us to increase the amount we collect from you to reflect any and all assessments or increases in the sales, use, occupational, property, lease, or other taxes imposed on such sale or lease of services, tangible property, or intellectual property, equipment, supplies and other goods purchased.
**15.2 Application and Credit Check.** You represent and warrant that statements made on your Application for this Agreement are true as of the date of your execution of this Agreement. Your signature on this Agreement authorizes us to perform any credit check deemed necessary with respect to Merchant and its directors, officers, affiliates, principals, and guarantors (if applicable).
**15.3 Section Headings.** The section headings of this Agreement are for convenience only and do not define, limit, or describe the scope or intent of this Agreement.
**15.4 Assignment.** Neither party may t assign or transfer their rights or delegate their responsibilities under this Agreement without prior written consent of the other party. Failure to obtain the other parties consent may result in termination of this Agreement.
**15.5 Parties.** This Agreement binds you and us and our respective heirs, representatives, successors (including those by merge and acquisition), and permitted assigns. You represent and warrant that your execution of and performance under this Agreement (i) in no way breaches, contravenes, violates, or in any manner conflicts with any of your other legal obligations, including, without limitation, your corporate charter or similar document or any agreement between you and any third party or affiliated entity; (ii) has been duly authorized by all necessary action and does not require any consent or other action by or in respect of any third party; and (iii) that the person signing this Agreement on your behalf is duly authorized to do so. In providing services to you, we will not be acting in the capacity of your agent, partner, or joint venturer; we are acting solely as an independent contractor. Each party agrees that any other party may publicly disclose, through press releases or otherwise, the existence of the business relationship that is the subject of this Agreement. Any such disclosure may identify the parties by name but shall not, without the prior written consent of the non-disclosing party, include any of the terms of this Agreement.
**15.6 Severability.** Should any provision of this Agreement be determined to be invalid or unenforceable under any law, rule, or regulation, including any Payment Brand Rule, such determination will not affect the validity or enforceability of any other provision of this Agreement.
**15.7 Waivers.** No term or condition of this Agreement may be waived except pursuant to a written waiver executed by the party against whom such waiver is sought to be enforced.
**15.8 Entire Agreement.** The Payment Brand Rules, Operating Guide, Application, and all schedules and attachments to this Agreement are made a part of this Agreement for all purposes. This Agreement represents the entire understanding between Merchant and Paymentech with respect to the matters contained herein and supersedes any prior agreements between the parties. This Agreement shall prevail over the terms of any agreement governing the Settlement Account and all prior agreements have been merged into this Agreement. Merchant agrees that in entering into this Agreement it has not relied on any statement of Paymentech or its representatives.
**15.9 Notices.** Except as otherwise provided in this Agreement, all notices must be given in writing and either hand delivered, faxed, mailed first class, postage prepaid, or sent via overnight carrier (and will be deemed to be given when so delivered or mailed) to the addresses set forth below or to such other address as either party may from time to time specify to the other party in writing.
**15.10 Governing Law; Waiver of Jury Trial.** This Agreement will be governed by and construed in accordance with the laws of the State of Texas without reference to conflict of law provisions. Any action, proceeding, litigation, or mediation relating to or arising from this Agreement must be brought by Paymentech against Merchant in the county and state of Merchant's principle office as indicated below, and by Merchant against Paymentech exclusively in Dallas County, Dallas, Texas. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS EITHER OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT.
**15.11 Force Majeure.** Neither party will be liable for delays in processing or other nonperformance caused by such events as fires, telecommunications failures, utility failures, power failures, equipment failures, labor strife, riots, war, terrorist attack, nonperformance of our vendors or suppliers, acts of God, or other causes over which the respective party has no reasonable control, except that nothing in this Section 15.11 will affect or excuse your liabilities and obligations for Chargebacks, refunds, or unfulfilled products and services.
**15.12 Amendment.** This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

May 2008

Exhibit B

Case 4:18-cv-02672 Document 1-4 Filed on 08/03/18 05/11/18 Page 40 of 50

16. **SURVIVAL.** The provisions of Sections 4.2, 4.4, 4.5, 4.6, 6.1, 7, 10.3, 11, 12, 14, 15, and 17 shall survive the termination of this Agreement.

17. **DEFINITIONS.**

"*Application*" is a statement of your financial condition, a description of the characteristics of your business or organization, and related information you have previously or concurrently submitted to us including credit and financial information, to induce us to enter into this Agreement with you and that has induced us to process your Transactions under the terms and conditions of this Agreement.

"*Chargeback*" is a reversal of a Transaction you previously presented to Paymentech pursuant to Payment Brand Rules.

"*Conveyed Transaction*" is any Payment Transaction conveyed to a Payment Brand for settlement by such Payment Brand directly to Merchant.

"*Customer*" is the person or entity to whom a Payment Instrument is issued or who is otherwise authorized to use a Payment Instrument.

"*Customer Information*" is personal information related to a Customer or a Customer's Payment Instrument that is obtained by a Merchant as part of a Transaction. Such information may include, but not be limited to, Customer's name, address, phone number, date of birth, Payment Instrument account number and expiration date, PIN data, CVV2 or CVC2 data, and any additional data that is read, scanned, or otherwise obtained from the Payment Instrument, whether printed thereon, or magnetically, electronically or otherwise stored thereon.

"*Effective Date*" means the date this Agreement takes effect pursuant to Section 10.1.

"*Payment Application*" is a third party application used by Merchant that is involved in the authorization or settlement of Transaction Data.

"*Payment Brand*" is any payment method provider whose payment method is accepted by Paymentech for processing, including, but not limited to, Visa, U.S.A., Inc., MasterCard International, Inc., Discover Financial Services, LLC and other credit and debit card providers, debit network providers, gift card and other stored value and loyalty program providers.

"*Payment Brand Rules*" are the bylaws, rules, and regulations, as they exist from time to time, of the Payment Brands.

"*Payment Instrument*" is an account, or evidence of an account, authorized and established between a Customer and a Payment Brand, or representatives or members of a Payment Brand that you accept from Customers. Payment Instruments include, but are not limited to, credit and debit cards, stored value cards, loyalty cards, electronic gift cards, authorized account or access numbers, paper certificates, credit accounts and the like.

"*Payment Instrument Information*" is personal information related to a Customer or the Customer's Payment Instrument, that is obtained by Merchant from the Customer's Payment Instrument, or from the Customer in connection with his or her use of a Payment Instrument (for example a security code, a PIN number, or the customer's Zip code when provided as part of an address verification system). Without limiting the foregoing, such information may include a Customer's name, Payment Instrument account number and expiration date, date of birth, PIN data, security code data such as CVV2, CVC2, and any data read, scanned, or otherwise obtained from the Payment Instrument, whether printed thereon, or magnetically, electronically or otherwise stored thereon.

"*Payment Transaction*" is a transaction conducted between a Customer and Merchant utilizing a Payment Instrument in which consideration is exchanged between the Customer and Merchant.

"*Permitted Customer Information*" is Customer Information which is permitted to be stored in an unreadable format pursuant to the Payment Brand Rules. Currently, permitted information, as of the date of this Agreement, is limited to the Customer's name, the Payment Instrument's account number, and the Payment Instrument's expiration date, if any.

"*Retrieval Request*" is a request for information by a Customer or Payment Brand relating to a claim or complaint concerning a Transaction.

"*Service Provider*" is any party that processes, stores or transmits Customer Information on your behalf, including, but not limited to your agents, business partners, contractors and subcontractors.

"*Stored Value Transaction*" is a Payment Transaction utilizing a Payment Instrument issued by or on the behalf of a Merchant in which a Customer receives value from the Merchant in exchange for consideration from the Customer.

"*Transaction*" is a Stored Value Transaction and/or a Payment Transaction.

"*Transaction Data*" is the written or electronic record of a Transaction.

"*Security Guidelines*" are any rule, regulation, standard or guideline published, provided, or amended from time to time, by the Payment Brands or the Payment Card Industry Security Standards Council ("PCI SSC"), including but not limited to the Payment Card Industry Data Security Standard's ("PCI DSS"), Visa's Cardholder Information Security Program ("CISP"), Discover's Information Security & Compliance Program, American Express's Data Security Operating Policy, MasterCard's Site Data Protection Program ("SDP"), Visa's Payment Application Best Practices ("PABP"), the Payment Card Industry's Payment Application Data Security Standard ("PA-DSS"), MasterCard's POS Terminal Security program, and the Payment Card Industry PIN Entry Device Standard.

18. **Signing Bonus.**

18.1 Paymentech will pay Merchant a cash signing bonus in an aggregate amount of $75,000 (the "Bonus") to be paid promptly after the execution of this Agreement by both parties (the "Effective Date").

18.2 Merchant understands that the payment of the Bonus is based on Paymentech's assumptions that (i) Merchant will process all its Card transactions with Paymentech for at least five (5) years from the Effective Date (the "Bonus Term") and (ii) the total annual credit and debit Card transactions during each one year period during the Bonus Term will equal or exceed 10,000,000 transactions (the "Minimum Volume"). To the extent that these assumptions prove to be inaccurate, Merchant agrees to repay all or a portion of the Bonus to Paymentech in accordance with the following terms: (i) Should this Agreement terminate for any reason prior to the expiration of the Bonus Term, Merchant will pay to Paymentech a portion of the Bonus calculated by dividing the total Bonus paid at the time of such termination by the number of days in the Bonus Term; the product of which shall then be multiplied by the number of days remaining in the Bonus Term after the termination described herein; (ii) if, during any one year period during the Bonus Term Paymentech does not process the Minimum Volume, Merchant agrees to repay 1% of the Bonus to Paymentech for each percent the actual volume is less than the Minimum Volume, but in no event in an amount that exceeds the entire Bonus. Merchant agrees that Paymentech may collect any refunds in the same manner permitted under Section 4 of the Agreement.

19. **Service Levels.** See Exhibit A to this Agreement.

Agreed and Accepted by:

Landry's Management, L.P.

By (authorized signature) _K H Lien_

Print Name and Title _CFO_

Date _12/08_

Address

City, State Zip

Agreed and Accepted by:

PAYMENTECH, LLC for itself and on behalf of JPMORGAN CHASE BANK, N.A.

By David Miller

Print Name _Managing Director of Credit_

Title _4 Northeastern Blvd Salem, NH 03079_

Address _DECEMBER 31, 2008_

Date

May 2008

Exhibit B

01/09/2008 07:42 FAX  214 849  3        CHASE PAYMENTECH                    ☒006/011

To Be Completed By Paymentech, LLC
Your Merchant Agreement Contract Number is: ___124.0077 - 321555___
Your Merchant Processing Identification Number Will Be Provided At Time of Processing Set Up

Unofficial Copy Office of Chris Daniel District Clerk

May2008

PAYMENTECH, LLC
DECEMBER 2015 AMENDMENT TO
SELECT MERCHANT PAYMENT CARD PROCESSING AGREEMENT

MERCHANT NAME: LANDRY'S MANAGEMENT, L.P.

This December 2015 Amendment to the Select Merchant Payment Card Processing Agreement (the "Amendment") amends and attaches to the Select Merchant Payment Card Processing Agreement, dated on or about December 31, 2008, as may have been amended (the "Agreement), between Chase Paymentech, LLC, for itself and on behalf of JPMorgan Chase Bank, N.A. a national banking association (collectively "Member"), and Landry's, Inc. (successor in interest to Landry's Management, L.P.) and its Affiliates identified on the attached Exhibit 1 (collectively "Merchant"). This Amendment is dated as of the date last signed below (the "Effective Date"). Except as otherwise defined herein, capitalized terms used herein shall have the meaning assigned to them in the Agreement. All references to section numbers herein shall refer to the corresponding section of the Agreement. To the extent that any conflict or inconsistency exists between the terms of this Amendment and the Agreement, the terms of this Amendment will control.

1. **REVOCATION OF NOTICE OF TERMINATION.**

Merchant hereby revokes its Notice of Termination of Merchant Services, dated October 28, 2015, and acknowledges and agrees the Agreement remains in full force and effect, except as amended herein.

2. **EXCLUSIVITY REPLACED WITH VOLUME COMMITMENT.**

Notwithstanding anything in the Agreement to the contrary, Merchant agrees that it will not terminate the Agreement and will process all of the Transactions of the merchant outlets identified on Exhibit 1 attached hereto ("Existing Merchants") with Paymentech until such time as one or more of the following has occurred:

    (a)    The Payment Brands bill the assessments, fines and penalties (collectively "Losses") resulting from Merchant's actual or suspected data security compromise event and the Losses are fully paid by Merchant, or

    (b)    The Payment Brands confirm in writing that there will be no Losses as a result of Merchant's actual or suspected data security compromise event.

    (c)    Five hundred forty (540) days have passed since final PFI Report is submitted to the Payment Brands and the Payment Brands have not notified Paymentech or Merchant of Losses resulting from Merchant's actual or suspected data security compromise event.

In the event that any one or more of the aforementioned pre-conditions, identified as (a), (b) and (c) above, has occurred, Merchant may terminate the Agreement upon thirty (30) days prior written notice to Paymentech and Merchant may continue migrating its Transactions to another payment processor following the expiration of such 30-day notice period.

If Merchant ceases submitting the Transactions of any Existing Merchant for any five (5) consecutive days, then Merchant agrees to immediately fund a Reserve Account (as defined in the Agreement).

3. **AUTO-RENEWAL TERM.**

Section 10.1 of the Agreement is hereby deleted in its entirety. Notwithstanding anything to the contrary contained herein or in the Agreement, the Agreement shall continue in effect until (i) either party terminates by providing the other party with at least 180 days prior written notice of termination; (ii) Merchant terminates this Agreement in the manner (and upon such shorter notice) specified in Section 2 of this Amendment; or (iii) Paymentech terminates this Agreement in the manner (and upon such shorter notice) as may otherwise be provided in the Agreement.

4. **CONTINUED EFFECT.** Except to the extent amended hereby, all terms, provisions and conditions of the Agreement are hereby ratified and shall continue in full force and effect and the Agreement shall remain enforceable and binding in accordance with its terms.

This Amendment shall be effective on the Effective Date.

Agreed and Accepted by:

LANDRY'S MANAGEMENT, L.P.
MERCHANT LEGAL NAME (Print or Type)
1510 West Loop South, Houston TX 77027
Address (Print or Type)

By (Authorized Signature)

Steven L. Scheinthal, V.P.
By, Name, Title (Print or Type)

12/03/15
Date

Agreed and Accepted by:

PAYMENTECH, LLC for itself and on behalf of
JPMorgan Chase Bank, N.A.

By:

Print Name: DAVID MILLER

Title: VP CREDIT

Date: 12-23-15

Address: 14221 N. DALLAS PKWY, DALLAS TX 75254

Unofficial Copy Office of Chris Daniel District Clerk

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Paymentech, LLC
JPMorgan Chase Bank, N.A.

**DEFENDANTS**
Landry's Inc.

**(b)** County of Residence of First Listed Plaintiff    Ohio
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Harris County, Texas
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
David Levy, Morgan, Lewis & Bockius LLP, 1000 Louisiana Street, Suite 4000, Houston, Texas 77002, 713-890-5000

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question
*(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☒ 4 Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 1332, 1441(b)
Brief description of cause:
Breach of Contract

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
20,062,206.88

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
05/17/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/ David Levy

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP   Exhibit B   JUDGE _____ MAG. JUDGE _____

7/6/2018 4:16:34 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 25802633
By: ELDRIDGE, WALTER F
Filed: 7/6/2018 4:16:34 PM

# CIVIL PROCESS REQUEST

## 2018-45222 / Court: 234

**FOR EACH PARTY SERVED YOU MUST FURNISH ONE (1) COPY OF THE PLEADING**
**FOR WRITS FURNISH TWO (2) COPIES OF THE PLEADING PER PARTY TO BE SERVED**

**CASE NUMBER:** _____  **CURRENT COURT:** Harris County District Court No. ____

**TYPE OF INSTRUMENT TO BE SERVED** (See Reverse For Types): Original Citation

**FILE DATE OF MOTION:** Original Petition filed 07 06 2018
Month/ Day/ Year

**SERVICE TO BE ISSUED ON** (Please List Exactly As The Name Appears In The Pleading To Be Served):

1. **NAME:** The Insurance Company of The State of Pennsylvania

   **ADDRESS:** 211 East 7th Street, Suite 620, Austin, TX 78701

   **AGENT,** (if applicable): Corporation Service Company

**TYPE OF SERVICE/PROCESS TO BE ISSUED** (see reverse for specific type): _____

**SERVICE BY** (check one):
- [X] **ATTORNEY PICK-UP**          [ ] **CONSTABLE**
- [ ] **CIVIL PROCESS SERVER** - Authorized Person to Pick-up: _____ Phone: _____
- [ ] **MAIL**                       [ ] **CERTIFIED MAIL**
- [ ] **PUBLICATION:**
  - Type of Publication: [ ] **COURTHOUSE DOOR, or**
  - [ ] **NEWSPAPER OF YOUR CHOICE:** _____
- [ ] **OTHER,** explain _____

**********************************************************************************************
****

2. **NAME:** _____

   **ADDRESS:** _____

   **AGENT,** (if applicable): _____

**TYPE OF SERVICE/PROCESS TO BE ISSUED** (see reverse for specific type): _____

**SERVICE BY** (check one):
- [ ] **ATTORNEY PICK-UP**          [ ] **CONSTABLE**
- [ ] **CIVIL PROCESS SERVER** - Authorized Person to Pick-up: _____ Phone: _____
- [ ] **MAIL**                       [ ] **CERTIFIED MAIL**
- [ ] **PUBLICATION:**
  - Type of Publication: [ ] **COURTHOUSE DOOR, or**
  - [ ] **NEWSPAPER OF YOUR CHOICE:** _____
- [ ] **OTHER,** explain _____

**ATTORNEY (OR ATTORNEY'S AGENT) REQUESTING SERVICE:**

**NAME:** Micah E. Skidmore     **TEXAS BAR NO./ID NO.** 24046856

**MAILING ADDRESS:** 2323 Victory Avenue, Suite 700, Dallas, Texas 75219

**PHONE NUMBER:** 214 651-5000     **FAX NUMBER:** 214 651-54940
area code    phone number              area code    fax number

**EMAIL ADDRESS:** micah.skidmore@haynesboone.com

CIVIC08 Revised 9/2/09

SERVICE REQUESTS WHICH CANNOT BE PROCESSED BY THIS OFFICE WILL BE HELD FOR 30 DAYS PRIOR TO CANCELLATION.  FEES WILL BE REFUNDED ONLY UPON REQUEST, OR AT THE DISPOSITION OF THE CASE. SERVICE REQUESTS MAY BE REINSTATED UPON APPROPRIATE ACTION BY THE PARTIES.

INSTRUMENTS TO BE SERVED:
(Fill In Instrument Sequence Number, i.e. 1st, 2nd, etc.)

ORIGINAL PETITION
_____   AMENDED PETITION
_____   SUPPLEMENTAL PETITION

COUNTERCLAIM
_____   AMENDED COUNTERCLAIM
_____   SUPPLEMENTAL COUNTERCLAIM

CROSS-ACTION:
_____   AMENDED CROSS-ACTION
_____   SUPPLEMENTAL CROSS-ACTION

THIRD-PARTY PETITION:
_____   AMENDED THIRD-PARTY PETITION
_____   SUPPLEMENTAL THIRD-PARTY PETITION

INTERVENTION:
_____   AMENDED INTERVENTION
_____   SUPPLEMENTAL INTERVENTION

INTERPLEADER
_____   AMENDED INTERPLEADER
_____   SUPPLEMENTAL INTERPLEADER

INJUNCTION

MOTION TO MODIFY

SHOW CAUSE ORDER

TEMPORARY RESTRAINING ORDER

BILL OF DISCOVERY:
_____ ORDER TO: _____
(specify)

_____ MOTION TO: _____
(specify)

PROCESS TYPES:

NON WRIT:
CITATION
ALIAS CITATION
PLURIES CITATION
SECRETARY OF STATE CITATION
COMMISSIONER OF INSURANCE
HIGHWAY COMMISSIONER
CITATION BY PUBLICATION
NOTICE
SHORT FORM NOTICE

PRECEPT (SHOW CAUSE)
RULE 106 SERVICE

SUBPOENA

WRITS:
ATTACHMENT (PROPERTY)
ATACHMENT (WITNESS)
ATTACHMENT (PERSON)

CERTIORARI

EXECUTION
EXECUTION AND ORDER OF SALE

GARNISHMENT BEFORE JUDGMENT
GARNISHMENT AFTER JUDGMENT

HABEAS CORPUS
INJUNCTION
TEMPORARY RESTRAINING ORDER

PROTECTIVE ORDER (FAMILY CODE)
PROTECTIVE ORDER (CIVIL CODE)

POSSESSION (PERSON)
POSSESSION (PROPERTY)

SCIRE FACIAS
SEQUESTRATION
SUPERSEDEAS

CIVIC108 Revised 9/3/99

7/6/2018 4:16:34 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 25802633
By: ELDRIDGE, WALTER F
Filed: 7/6/2018 4:16:34 PM

CIVIL CASE INFORMATION SHEET

CAUSE NUMBER *(FOR CLERK USE ONLY)*: **2018-45222 / Court: 234**    COURT *(FOR CLERK USE ONLY)*: _____

STYLED Landry's Inc. as successor in interest to Landry's Management, LP v. The Insurance Company of the State of Pennsylvania
*(e.g., John Smith v. All American Insurance Co; In re Mary Ann Jones; In the Matter of the Estate of George Jackson)*

A civil case information sheet must be completed and submitted when an original petition or application is filed to initiate a new civil, family law, probate, or mental health case or when a post-judgment petition for modification or motion for enforcement is filed in a family law case. The information should be the best available at the time of filing.

| 1. Contact information for person completing case information sheet: | Names of parties in case: | Person or entity completing sheet is: |
|---|---|---|
| **Name:** Micah Skidmore<br><br>**Email:** micah.skidmore@haynesboone.com | **Plaintiff(s)/Petitioner(s):**<br>Landry's Inc. | ☒ Attorney for Plaintiff/Petitioner<br>☐ *Pro Se* Plaintiff/Petitioner<br>☐ Title IV-D Agency<br>☐ Other: _____ |
| **Address:** 2323 Victory Ave, Ste. 700<br><br>**Telephone:** (214) 651-5000 | | **Additional Parties in Child Support Case:** |
| **City/State/Zip:** Dallas, Texas 75219<br><br>**Fax:** (214) 541-5940 | **Defendant(s)/Respondent(s):**<br>The Insurance Company of the<br>State of Pennsylvania | **Custodial Parent:**<br><br>**Non-Custodial Parent:** |
| **Signature:** [signature]<br><br>**State Bar No:** 24046856 | *[Attach additional page as necessary to list all parties]* | **Presumed Father:** |

**2. Indicate case type, or identify the most important issue in the case** *(select only 1)*:

| Civil | | | | Family Law |
|---|---|---|---|---|
| **Contract** | **Injury or Damage** | **Real Property** | **Marriage Relationship** | **Post-judgment Actions (non-Title IV-D)** |
| *Debt/Contract*<br>☐ Consumer/DTPA<br>☐ Debt/Contract<br>☐ Fraud/Misrepresentation<br>☐ Other Debt/Contract: | ☐ Assault/Battery<br>☐ Construction<br>☐ Defamation<br>*Malpractice*<br>  ☐ Accounting<br>  ☐ Legal<br>  ☐ Medical | ☐ Eminent Domain/<br>  Condemnation<br>☐ Partition<br>☐ Quiet Title<br>☐ Trespass to Try Title<br>☐ Other Property: | ☐ Annulment<br>☐ Declare Marriage Void<br>*Divorce*<br>  ☐ With Children<br>  ☐ No Children | ☐ Enforcement<br>☐ Modification—Custody<br>☐ Modification—Other<br>**Title IV-D** |
| *Foreclosure*<br>☐ Home Equity—Expedited<br>☐ Other Foreclosure<br>☐ Franchise<br>☒ Insurance<br>☐ Landlord/Tenant<br>☐ Non-Competition<br>☐ Partnership<br>☐ Other Contract: |   ☐ Other Professional<br>    Liability:<br><br>☐ Motor Vehicle Accident<br>☐ Premises<br>*Product Liability*<br>  ☐ Asbestos/Silica<br>  ☐ Other Product Liability<br>    List Product:<br><br>☐ Other Injury or Damage: | **Related to Criminal Matters**<br>☐ Expunction<br>☐ Judgment Nisi<br>☐ Non-Disclosure<br>☐ Seizure/Forfeiture<br>☐ Writ of Habeas Corpus—<br>  Pre-indictment<br>☐ Other: | **Other Family Law**<br>☐ Enforce Foreign<br>  Judgment<br>☐ Habeas Corpus<br>☐ Name Change<br>☐ Protective Order<br>☐ Removal of Disabilities<br>  of Minority<br>☐ Other: | ☐ Enforcement/Modification<br>☐ Paternity<br>☐ Reciprocals (UIFSA)<br>☐ Support Order<br><br>**Parent-Child Relationship**<br>☐ Adoption/Adoption with<br>  Termination<br>☐ Child Protection<br>☐ Child Support<br>☐ Custody or Visitation<br>☐ Gestational Parenting<br>☐ Grandparent Access<br>☐ Parentage/Paternity<br>☐ Termination of Parental<br>  Rights<br>☐ Other Parent-Child: |
| **Employment** | | **Other Civil** | | |
| ☐ Discrimination<br>☐ Retaliation<br>☐ Termination<br>☐ Workers' Compensation<br>☐ Other Employment: | | ☐ Administrative Appeal<br>☐ Antitrust/Unfair<br>  Competition<br>☐ Code Violations<br>☐ Foreign Judgment<br>☐ Intellectual Property | ☐ Lawyer Discipline<br>☐ Perpetuate Testimony<br>☐ Securities/Stock<br>☐ Tortious Interference<br>☐ Other: | |

| Tax | | Probate & Mental Health | |
|---|---|---|---|
| ☐ Tax Appraisal<br>☐ Tax Delinquency<br>☐ Other Tax | *Probate/Wills/Intestate Administration*<br>☐ Dependent Administration<br>☐ Independent Administration<br>☐ Other Estate Proceedings | ☐ Guardianship—Adult<br>☐ Guardianship—Minor<br>☐ Mental Health<br>☐ Other: | |

**3. Indicate procedure or remedy, if applicable** *(may select more than 1)*:
| | | |
|---|---|---|
| ☐ Appeal from Municipal or Justice Court<br>☐ Arbitration-related<br>☐ Attachment<br>☐ Bill of Review<br>☐ Certiorari<br>☐ Class Action | ☒ Declaratory Judgment<br>☐ Garnishment<br>☐ Interpleader<br>☐ License<br>☐ Mandamus<br>☐ Post-judgment | ☐ Prejudgment Remedy<br>☐ Protective Order<br>☐ Receiver<br>☐ Sequestration<br>☐ Temporary Restraining Order/Injunction<br>☐ Turnover |

**4. Indicate damages sought** *(do not select if it is a family law case)*:
☐ Less than $100,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorney fees
☐ Less than $100,000 and non-monetary relief
☐ Over $100, 000 but not more than $200,000
☐ Over $200,000 but not more than $1,000,000
☒ Over $1,000,000

Rev 2/13

7/6/2018 4:16:34 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 25802633
By: ELDRIDGE, WALTER F
Filed: 7/6/2018 4:16:34 PM

CIVIL CASE INFORMATION SHEET

CAUSE NUMBER *(FOR CLERK USE ONLY)*: _____   COURT *(FOR CLERK USE ONLY)*: _____

STYLED Landry's Inc. as successor in interest to Landry's Management, LP v. The Insurance Company of the State of Pennsylvania
(e.g., John Smith v. All American Insurance Co; In re Mary Ann Jones; In the Matter of the Estate of George Jackson)

A civil case information sheet must be completed and submitted when an original petition or application is filed to initiate a new civil, family law, probate, or mental health case or when a post-judgment petition for modification or motion for enforcement is filed in a family law case. The information should be the best available at the time of filing.

| 1. Contact information for person completing case information sheet: | Names of parties in case: | Person or entity completing sheet is: |
|---|---|---|
| Name: Micah Skidmore  Email: micah.skidmore@haynesboone.com | Plaintiff(s)/Petitioner(s): Landry's Inc. | [X] Attorney for Plaintiff/Petitioner  [ ] *Pro Se* Plaintiff/Petitioner  [ ] Title IV-D Agency  [ ] Other: _____ |
| Address: 2323 Victory Ave, Ste. 700  Telephone: (214) 651-5000 | | Additional Parties in Child Support Case: |
| City/State/Zip: Dallas, Texas 75219  Fax: (214) 541-5940 | Defendant(s)/Respondent(s): The Insurance Company of the State of Pennsylvania | Custodial Parent: _____  Non-Custodial Parent: _____ |
| Signature: *[signature]*  State Bar No: 24046856 | [Attach additional page as necessary to list all parties] | Presumed Father: _____ |

## 2. Indicate case type, or identify the most important issue in the case *(select only 1)*:

| Civil | | | Family Law | |
|---|---|---|---|---|
| **Contract** | **Injury or Damage** | **Real Property** | **Marriage Relationship** | **Post-judgment Actions (non-Title IV-D)** |
| *Debt/Contract* [ ] Consumer/DTPA [ ] Debt/Contract [ ] Fraud/Misrepresentation [ ] Other Debt/Contract: | [ ] Assault/Battery [ ] Construction [ ] Defamation *Malpractice* [ ] Accounting [ ] Legal [ ] Medical [ ] Other Professional Liability: | [ ] Eminent Domain/ Condemnation [ ] Partition [ ] Quiet Title [ ] Trespass to Try Title [ ] Other Property: | [ ] Annulment [ ] Declare Marriage Void *Divorce* [ ] With Children [ ] No Children | [ ] Enforcement [ ] Modification—Custody [ ] Modification—Other |
| *Foreclosure* [ ] Home Equity—Expedited [ ] Other Foreclosure [ ] Franchise [X] Insurance [ ] Landlord/Tenant [ ] Non-Competition [ ] Partnership [ ] Other Contract: | [ ] Motor Vehicle Accident [ ] Premises *Product Liability* [ ] Asbestos/Silica [ ] Other Product Liability List Product: | **Related to Criminal Matters** [ ] Expunction [ ] Judgment Nisi [ ] Non-Disclosure [ ] Seizure/Forfeiture [ ] Writ of Habeas Corpus— Pre-indictment [ ] Other: | **Other Family Law** [ ] Enforce Foreign Judgment [ ] Habeas Corpus [ ] Name Change [ ] Protective Order [ ] Removal of Disabilities of Minority [ ] Other: | **Title IV-D** [ ] Enforcement/Modification [ ] Paternity [ ] Reciprocals (UIFSA) [ ] Support Order **Parent-Child Relationship** [ ] Adoption/Adoption with Termination [ ] Child Protection [ ] Child Support [ ] Custody or Visitation [ ] Gestational Parenting [ ] Grandparent Access [ ] Parentage/Paternity [ ] Termination of Parental Rights [ ] Other Parent-Child: |
| | [ ] Other Injury or Damage: | | | |
| **Employment** | | **Other Civil** | | |
| [ ] Discrimination [ ] Retaliation [ ] Termination [ ] Workers' Compensation [ ] Other Employment: | [ ] Administrative Appeal [ ] Antitrust/Unfair Competition [ ] Code Violations [ ] Foreign Judgment [ ] Intellectual Property | [ ] Lawyer Discipline [ ] Perpetuate Testimony [ ] Securities/Stock [ ] Tortious Interference [ ] Other: | | |

| Tax | Probate & Mental Health | |
|---|---|---|
| [ ] Tax Appraisal [ ] Tax Delinquency [ ] Other Tax | *Probate/Wills/Intestate Administration* [ ] Dependent Administration [ ] Independent Administration [ ] Other Estate Proceedings | [ ] Guardianship—Adult [ ] Guardianship—Minor [ ] Mental Health [ ] Other: |

## 3. Indicate procedure or remedy, if applicable *(may select more than 1)*:

| | | |
|---|---|---|
| [ ] Appeal from Municipal or Justice Court | [X] Declaratory Judgment | [ ] Prejudgment Remedy |
| [ ] Arbitration-related | [ ] Garnishment | [ ] Protective Order |
| [ ] Attachment | [ ] Interpleader | [ ] Receiver |
| [ ] Bill of Review | [ ] License | [ ] Sequestration |
| [ ] Certiorari | [ ] Mandamus | [ ] Temporary Restraining Order/Injunction |
| [ ] Class Action | [ ] Post-judgment | [ ] Turnover |

## 4. Indicate damages sought *(do not select if it is a family law case)*:

[ ] Less than $100,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorney fees
[ ] Less than $100,000 and non-monetary relief
[ ] Over $100, 000 but not more than $200,000
[ ] Over $200,000 but not more than $1,000,000
[X] Over $1,000,000

Rev 2/13

Exhibit B

7/6/2018 4:16:34 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 25802633
By: ELDRIDGE, WALTER F
Filed: 7/6/2018 4:16:34 PM

# CIVIL PROCESS REQUEST

**FOR EACH PARTY SERVED YOU MUST FURNISH ONE (1) COPY OF THE PLEADING**
**FOR WRITS FURNISH TWO (2) COPIES OF THE PLEADING PER PARTY TO BE SERVED**

**CASE NUMBER:** _____   **CURRENT COURT:** Harris County District Court No. _____

**TYPE OF INSTRUMENT TO BE SERVED** (See Reverse For Types): ___ Original Citation _____

**FILE DATE OF MOTION:** ___ Original Petition ___ filed ___ 07 ____ 06 ____ 2018 _____
                                                                          Month/       Day/       Year

**SERVICE TO BE ISSUED ON** (Please List Exactly As The Name Appears In The Pleading To Be Served):

1. **NAME:** ___ The Insurance Company of The State of Pennsylvania _____

   **ADDRESS:** ___ 211 East 7th Street, Suite 620, Austin, TX  78701 _____

   **AGENT,** (*if applicable*): ___ Corporation Service Company _____

**TYPE OF SERVICE/PROCESS TO BE ISSUED** (*see reverse for specific type*): _____

   **SERVICE BY** (*check one*):
   - [X] **ATTORNEY PICK-UP**                    [ ] **CONSTABLE**
   - [ ] **CIVIL PROCESS SERVER -** Authorized Person to Pick-up: _____   Phone: _____
   - [ ] **MAIL**                                        [ ] **CERTIFIED MAIL**
   - [ ] **PUBLICATION:**
         Type of Publication:   [ ] **COURTHOUSE DOOR,** or
                                [ ] **NEWSPAPER OF YOUR CHOICE:** _____
   - [ ] **OTHER,** *explain* _____

*********************************************************************************

****

2. **NAME:** _____

   **ADDRESS:** _____

   **AGENT,** (*if applicable*): _____

**TYPE OF SERVICE/PROCESS TO BE ISSUED** (*see reverse for specific type*): _____

   **SERVICE BY** (*check one*):
   - [ ] **ATTORNEY PICK-UP**                    [ ] **CONSTABLE**
   - [ ] **CIVIL PROCESS SERVER -** Authorized Person to Pick-up: _____   Phone: _____
   - [ ] **MAIL**                                        [ ] **CERTIFIED MAIL**
   - [ ] **PUBLICATION:**
         Type of Publication:   [ ] **COURTHOUSE DOOR,** or
                                [ ] **NEWSPAPER OF YOUR CHOICE:** _____
   - [ ] **OTHER,** *explain* _____

**ATTORNEY (OR ATTORNEY'S AGENT) REQUESTING SERVICE:**

**NAME:** ___ Micah E. Skidmore _____   **TEXAS BAR NO./ID NO.** ___ 24046856 ____

**MAILING ADDRESS:** ___ 2323 Victory Avenue, Suite 700, Dallas, Texas  75219 _____

**PHONE NUMBER:** ___ 214 ___   ___ 651-5000 ___   **FAX NUMBER:** ___ 214 ___   ___ 651-54940 ___
                    area code        phone number                         area code        fax number

**EMAIL ADDRESS:** ___ micah.skidmore@haynesboone.com _____

CIVIC108 Revised 9/3/99

Exhibit B

SERVICE REQUESTS WHICH CANNOT BE PROCESSED BY THIS OFFICE WILL BE HELD FOR 30 DAYS PRIOR TO CANCELLATION.  FEES WILL BE REFUNDED ONLY UPON REQUEST, OR AT THE DISPOSITION OF THE CASE. SERVICE REQUESTS MAY BE REINSTATED UPON APPROPRIATE ACTION BY THE PARTIES.

INSTRUMENTS TO BE SERVED:
(Fill In Instrument Sequence Number, i.e. 1st, 2nd, etc.)

ORIGINAL PETITION
_____     AMENDED PETITION
_____     SUPPLEMENTAL PETITION


COUNTERCLAIM
_____     AMENDED COUNTERCLAIM
_____     SUPPLEMENTAL COUNTERCLAIM

CROSS-ACTION:
_____     AMENDED CROSS-ACTION
_____     SUPPLEMENTAL CROSS-ACTION

THIRD-PARTY PETITION:
_____     AMENDED THIRD-PARTY PETITION
_____     SUPPLEMENTAL THIRD-PARTY PETITION

INTERVENTION:
_____     AMENDED INTERVENTION
_____     SUPPLEMENTAL INTERVENTION

INTERPLEADER
_____     AMENDED INTERPLEADER
_____     SUPPLEMENTAL INTERPLEADER


INJUNCTION

MOTION TO MODIFY

SHOW CAUSE ORDER

TEMPORARY RESTRAINING ORDER


BILL OF DISCOVERY:
     ORDER TO: _____
                              (specify)

     MOTION TO: _____
                              (specify)

PROCESS TYPES:

NON WRIT:
CITATION
ALIAS CITATION
PLURIES CITATION
SECRETARY OF STATE CITATION
COMMISSIONER OF INSURANCE
HIGHWAY COMMISSIONER
CITATION BY PUBLICATION
NOTICE
SHORT FORM NOTICE

PRECEPT (SHOW CAUSE)
RULE 106 SERVICE

SUBPOENA

WRITS:
ATTACHMENT (PROPERTY)
ATACHMENT (WITNESS)
ATTACHMENT (PERSON)


CERTIORARI


EXECUTION
EXECUTION AND ORDER OF SALE

GARNISHMENT BEFORE JUDGMENT
GARNISHMENT AFTER JUDGMENT

HABEAS CORPUS
INJUNCTION
TEMPORARY RESTRAINING ORDER

PROTECTIVE ORDER (FAMILY CODE)
PROTECTIVE ORDER (CIVIL CODE)


POSSESSION (PERSON)
POSSESSION (PROPERTY)


SCIRE FACIAS
SEQUESTRATION
SUPERSEDEAS

Unofficial Copy Office of Chris Daniel District Clerk

CIVC108 Revised 9/3/99